# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

SANTIAGO GOMEZ,

               Plaintiff,

    v.

HAROLD D. GRAHAM, *et al.*,

               Defendants.

_____

Civil Action No.
9:14-CV-0201 (DNH/DEP)

APPEARANCES:

FOR PLAINTIFF:

SANTIAGO GOMEZ, *Pro Se*
13-A-2110
Franklin Correctional Facility
P.O. Box 10
Malone, NY 12953

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
615 Erie Blvd. West, Suite 102
Syracuse, NY 13204

OF COUNSEL:

KEVIN HAYDEN, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action brought by *pro se* plaintiff Santiago Gomez, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against seven individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), in which he alleges that his civil rights have been violated. In his complaint, as amended, plaintiff contends that defendants used excessive force against him, retaliated against him for filing grievances, and exposed him to cruel and unusual punishment by, *inter alia*, failing to provide him with toilet paper for ten days and requiring him to wear restraints during family visits.

Currently pending before the court is a motion brought by defendants seeking the entry of summary judgment dismissing plaintiff's second amended complaint ("SAC"). For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied.

I.     <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 14. Although he is now confined

---

[1]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

elsewhere, at the various times relevant to the claims in this action, plaintiff was incarcerated at the Downstate Correctional Facility ("Downstate"), Auburn Correctional Facility ("Auburn"), Adirondack Correctional Facility ("Adirondack"), and Upstate Correctional Facility ("Upstate"). *Id.*

### A.    Downstate

On or about July 31, 2013, plaintiff was transferred to Downstate for a court appearance. Dkt. No. 14 at 7. While confined at Downstate, plaintiff filed a grievance with the facility superintendent complaining of hazardous living conditions at the prison. *Id.*; Dkt. No. 80-4 at 16. According to plaintiff, during his transit out of Downstate, his legal papers "were lost." Dkt. No. 14 at 7; Dkt. No. 80-4 at 16.

### B.    Auburn

In or around September 2013, while at Auburn, plaintiff encountered defendant D. Murray while he was on his way to the law library. Dkt. No. 14 at 8. Plaintiff alleges that, without provocation from him, defendant Murray threatened to "put a weapon on [him]." *Id.*; Dkt. No. 80-4 at 19, 26. Plaintiff thereafter filed a grievance regarding this incident. Dkt. No. 14 at 8; Dkt. No. 80-4 at 24. According to plaintiff, he informally resolved this grievance with a corrections sergeant by signing a form that waived his

claims against defendant Murray and "neutralized" the conflict between him and the corrections officer. Dkt. No. 14 at 8; Dkt. No. 80-4 at 28.

Between November and December 2013, plaintiff was denied access to the law library on approximately twelve occasions by defendant Murray. Dkt. No. 14 at 8; Dkt. No. 82 at 10. The first denial occurred approximately two weeks after plaintiff met with the corrections sergeant to informally resolve his grievance against defendant Murray. Dkt. No. 80-4 at 30. Plaintiff contends that he attempted to file a grievance against Murray regarding these denials, but vaguely alleges he "was rebuffed[.]" Dkt. No. 82 at 10; *see also* Dkt. No. 14 at 9; Dkt. No. 80-4 at 33.

On December 26, 2013, as plaintiff was exiting the general library, defendant Murray subjected him to a frisk search. Dkt. No. 14 at 10-11; Dkt. No. 80-4 at 51. During the search, Corrections Officer French, who is not a named defendant, arrived and asked defendant Murray if plaintiff was "the [individual] that grieved [him.]" Dkt. No. 14 at 11; Dkt. No. 80-4 at 52. When defendant Murray answered in the affirmative, Officer French then placed plaintiff on keeplock status.[2] Dkt. No. 14 at 11; Dkt. No 80-4 at

---

[2]    "Keeplock" is a form of confinement through which an "inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *accord, Warburton v. Goord*, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998); *Tinsley v. Greene*, No. 95-CV-1765, 1997 WL 160124, at *2 n.2 (N.D.N.Y. Mar. 31, 1997) (Pooler, J., *adopting report and recommendation by* Homer, M.J.) (citing *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir.

56. The next day, he was issued an allegedly false misbehavior report stemming from his interaction with defendant Murray and Officer French. Dkt. No. 14 at 11, 12; Dkt. No. 80-4 at 56-57.

Although it is not precisely clear how long plaintiff was keeplocked, liberally construing the record evidence, it appears he remained in that disciplinary confinement for twenty-three days. Dkt. No. 14 at 13; Dkt. No. 80-4 at 65. Plaintiff alleges that while keeplocked, he was denied dinner on December 26, 2013, and thereafter deprived of beverages with every lunch and dinner, and denied toilet paper for ten days beginning on January 10, 2014. Dkt. No. 14 at 12-13; Dkt. No. 80-4 at 57-58, 66. Plaintiff contends that he was placed on keeplock status, issued a false misbehavior report, and denied dinner, beverages, and toilet paper by defendant Murray in retaliation for having filed grievances against him. Dkt. No. 14 at 12; Dkt. No. 80-4 at 61-62. Plaintiff also contends that, as the superintendent at Auburn, defendant Harold D. Graham is responsible for the conditions of plaintiff's keeplock confinement because, after learning about plaintiff's complaints, including through an in-person

---

1995)). "The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends." *Lee v. Coughlin*, 26 F. Supp. 2d 615, 628 (S.D.N.Y. 1998).

conversation, he failed to "rectify any civil rights violations[.]" Dkt. No. 80-4 at 126; *see also* Dkt. No. 14 at 21; Dkt. No. 82 at 15.

C.    Adirondack

In or around March 2014, plaintiff was transferred from Auburn to Adirondack. Dkt. No. 14 at 13. On May 3, 2014, defendant Sergeant Hahn approached plaintiff, threatened him with violence, and placed him on seventy-two hour investigation status because plaintiff's hair was allegedly in violation of prison regulations.[3] Dkt. No. 14 at 14; Dkt. No. 80-4 at 76. Plaintiff thereafter filed a grievance against defendant Hahn regarding this encounter on or about May 4, 2014. Dkt. No. 14 at 14; Dkt. No. 80-4 at 79. According to plaintiff, six days later, on May 10, 2014, "Defendant sergeant [H]han entered Plaintiff's living quaters [sic] . . . and made threats against plaintiff to cause bodily harm if plaintiff proceeded with his Grievance in any shape or form, Calling home, calling lawyer, advising the Inspector General." Dkt. No. 14 at 14; *see also* Dkt. Nos. 79, 81. Plaintiff contends that he immediately told defendant Hahn he would not proceed with his grievance, and that, the next day, when plaintiff was interviewed

---

[3]    In his SAC, the currently operative pleading, plaintiff explains that "[w]hile under 72- Investigation Plaintiff could not exercise, cook, call home, purchase commissary, and had to remain in assigned area under FULL BED STATUS- which out-lines what plaintiff can and can not [sic] do, plaintiff could not attend any programs." Dkt. No. 14 at 14 n.6; *see also* Dkt. No. 80-4 at 77-78.

by corrections staff regarding the grievance, he "stated he never filed such grievance[.]" Dkt. No. 14 at 15; *see also* Dkt. No. 80-4 at 81-83.

Plaintiff alleges that on or about May 13, 2014, he was assaulted by defendants Corrections Officers Borden, Neale, and Fletcher, and that defendant Hahn was present during the attack but failed to intervene to protect him. Dkt. No. 14 at 15; Dkt. No. 80-4 at 85-88. During the alleged assault, plaintiff lost consciousness and when he awoke "on the floor," the defendants were surrounding him" and defendant Hahn "stated to plaintiff 'stop filing stupid Papers,' which "[p]laintiff understood [] to mean stop filing grievances[.]" Dkt. No. 14 at 15. Plaintiff attempted to file a grievance that evening regarding this incident but it was "intercepted by staff[.]" Dkt. No. 80-4 at 106; *see also* Dkt. No. 14 at 15-16. The next day, defendant Hahn "entered Plaintiff[']s living qua[r]ters with plaintiff[']s grievance in hand and . . . stated 'It will never make to I.G.R.C. ,['] and walked away." Dkt. No. 14 at 16.

On May 15, 2014, defendant Corrections Officer J. Wright conducted a search of plaintiff's lockers. Dkt. No. 14 at 16; Dkt. No. 80-4 at 111. At the conclusion of the search, defendant Hahn appeared in plaintiff's area and allegedly directed defendant Wright to issue plaintiff a false misbehavior report for creating a disturbance. Dkt. No. 14 at 16; Dkt. No.

80-4 at 116. Plaintiff contends that defendant Wright issued the misbehavior report in retaliation for plaintiff filing grievances against defendant Hahn. Dkt. No. 14 at 19-20; Dkt. No. 80-4 at 116, 118. As a result of a disciplinary hearing that was subsequently conducted in connection with that misbehavior report, plaintiff was found guilty and sentenced to thirty days of disciplinary confinement in a special housing unit ("SHU"), a sentence in which he served at Upstate.[4] Dkt. No. 14 at 17.

D.  Upstate

Plaintiff alleges that while confined at Upstate he,

> suffered the following hardship[s]:
> a. Forced to remain in handcuffs waist chains during family visits;
> b. Loss of contact visits;
> c. Interference with Prescribed-medication for foot Fungus causing plaintiffs [sic] condition to become worse;
> d. Interfering with plaintiff school work returning college course books;
> e. 48-Hours extra confinement in a cell;
> f. 22 ½ hours of constaint [sic] confinement in a cell;
> g. Forced to deficate [sic] and shower in front of cellmate;
> h. denied access to doctor for severe back pain from defendant assault.

---

[4]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

Dkt. No. 14 at 17. Plaintiff contends that defendants Hahn and Wright are responsible for the conditions of his confinement at Upstate because they are the ones who initiated the disciplinary hearing that resulted in his SHU confinement by issuing him a false misbehavior report. Dkt. No. 80-4 at 120-21.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about February 27, 2014, with the filing of a complaint, accompanied by a motion for a temporary restraining order and preliminary injunction. Dkt. Nos. 1, 2. Because plaintiff failed to pay the required filing fee for initiating a civil action or submit an application to proceed in the matter *in forma pauperis*, the court administratively closed the action on March 4, 2014. Dkt. No. 3. On March 11, 2014, the court received the filing fee from plaintiff, Dkt. No. 4, and thereafter reopened the case on the same day. Dkt. No. 5. While plaintiff's complaint awaited initial review by the court pursuant to 28 U.S.C. § 1915A, plaintiff filed a first amended complaint, which was subsequently superseded by the SAC, filed by plaintiff on or about July 2, 2014. Dkt. Nos. 8, 14.

Plaintiff's SAC names the following individuals as defendants: (1) Harold D. Graham, the superintendent employed at Auburn; (2) D. Murray,

a corrections officer employed at Auburn; (3) Sergeant Hahn, a corrections sergeant stationed at Adirondack; (4) J. Wright, a corrections officer at Adirondack; (5) Borden, a corrections officer assigned at Adirondack; (6) Neale, a corrections officer employed at Adirondack; and (7) Fletcher, a corrections officer employed at Adirondack. Dkt. No. 14 at 1, 3-4.

Pursuant to 28 U.S.C. § 1915A, the court undertook an initial review of plaintiff's SAC and issued a report on October 3, 2014, recommending that the pleading be accepted for filing only with respect to the following three causes of action: (1) retaliation, asserted against defendants Murray, Hahn, Wright, Borden, Fletcher, and Neale;[5] (2) excessive force asserted against defendants Borden, Neale, Fletcher, and Hahn;[6] and (3) conditions of confinement asserted against all defendants. Dkt. No. 16. District Judge David N. Hurd adopted my report in a decision and order dated October 29, 2014, Dkt. No. 19.

Following the close of discovery, defendants filed the currently pending motion for summary judgment seeking dismissal of plaintiff's SAC in its entirety. Dkt. No. 80. In their motion, defendants seek dismissal of

---

[5]     The SAC contains several retaliation claims against the named defendants arising from separate instances. Those claims will be discussed more completely in part III.E. of this report.

[6]     The excessive force claim is asserted against defendant Hahn based on a failure to intervene theory. Dkt. No. 14 at 22.

the following claims based on plaintiff's failure to exhaust the available administrative remedies prior to filing this lawsuit: (1) excessive force claim, asserted against defendants Hahn, Borden, Fletcher, and Neale; (2) conditions of confinement claim, asserted against defendants Graham, Murray, Hahn, Wright, Borden, Neale, and Fletcher; and (3) retaliation claims, asserted against defendant Murray with respect to plaintiff's allegations that defendant Murray retaliated against him for filing grievances by denying him access to the law library and issuing him a false misbehavior report on December 26, 2013. Dkt. No. 80-15 at 14-17. Defendants also contend they are entitled to summary judgment in their favor on the merits with respect to the conditions-of-confinement claim, asserted against all defendants, based upon the lack of evidence in the record from which a reasonable factfinder could conclude that they were personally involved in any of the constitutional deprivations alleged by plaintiff. *Id.* at 17-19. Defendants further argue that plaintiff's retaliation claims, of which they contend there are seven articulated in plaintiff's SAC, are subject to dismissal, and in any event that they are all entitled to qualified immunity from suit. *Id.* at 19-26. Plaintiff has filed a response in opposition to defendants' motion, which includes not only a memorandum of law, declaration, and response to defendants' statement of undisputed

material facts, but also in excess of 430 pages of exhibits.[7] Dkt. No. 82. Defendants did not avail themselves of the opportunity to submit a reply.

Defendants' motion is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III. DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."

---

[7]    The court notes that, while it is under no obligation to scour the record in an attempt to find support for any of plaintiff's arguments, it will not turn a blind eye to any genuine dispute of material fact, should one be identified during its review of defendants' motion and plaintiff's opposition. *ABC v. NYU Hospitals Ctr.*, 629 F. App'x 46, 49 (2d Cir. 2015) (citing *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F. 3d 114, 125 (2d Cir. 2013)).

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary

judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

　　B.　　Exhaustion of Available Administrative Remedies

　　Defendants contend that three of plaintiff's causes of action are subject to dismissal based on his failure to exhaust the available administrative remedies prior to filing this lawsuit. Dkt. No. 80-15 at 14-17.

　　The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought

under Section 1983."). [8] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). [9]

In accordance with the PLRA, the DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it

---

[8]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[9]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[10] *Id.* at § 701.5(c)(i), (ii).

---

[10]     Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the

merits)." (quotation marks omitted)). With this backdrop in mind, I will now analyze the three claims that defendants contend remain unexhausted.

### 1. Excessive Force Claim, Asserted Against Defendants Borden, Neale, Fletcher, and Hahn

Plaintiff's SAC alleges that he was subjected to excessive force, in violation of his Eighth Amendment rights, on May 13, 2014, by defendants Borden, Neale, Fletcher, and Hahn while confined in Adirondack. Dkt. No. 14 at 15, 20-22. Specifically, plaintiff contends that, during a search of his person on that date,

> Defendant Fletcher started to slap plaintiff in the face and kick and knee his legs and back, defendant Borden was punching plaintiff in the back, while defendant[ ] [N]eale was slapping [p]laintiff[.] [D]efendant Borden [then] [p]laced plaintiff in a choke hold with his arms causing plaintiff to lose conscious[ness].

*Id.*; *see also* Dkt. No. 80-4 at 85-88; Dkt. No. 82 at 16-17. Plaintiff alleges that defendant Hahn was present for the assault and failed to intervene to protect Gomez from harm. Dkt. No. 14 at 15; Dkt. No. 82 at 16-17.

Defendants maintain that plaintiff did not appeal a grievance concerning the incident to the CORC in accordance with the IGP. Dkt. No. 80-15 at 9; Dkt. No. 80-6 at 5. In support of that position, they rely on the

declaration of Jeffery Hale, the Assistant Director of the IGP for the DOCCS, in which he attests that the relevant DOCCS records reflect plaintiff filed only eight appeals of grievances to the CORC between July 3, 2013 and October 26, 2015, none of which complained of an assault by officers at Adirondack. Dkt. No. 80-6 at 2, 5. Although plaintiff does not seriously contest that he failed to appeal to the CORC any grievance concerning the use-of-force incident on May 13, 2014 involving defendants Hahn, Fletcher, Neale, and Borden, he argues that he should be excused from the exhaustion requirement because defendant Hahn interfered with his attempt to file a grievance.[11] Dkt. No. 82 at 18; *see also* Dkt. No. 14 at 15-16; Dkt. No. 82-1 at 17-18.

While the PLRA's exhaustion requirement is strict in its application, before dismissing an action as a result of a plaintiff's failure to exhaust a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Ross v. Blake*, ___ S. Ct. ___, 2016 WL 3128839 at *7-8 (S. Ct. June 6, 2016); *see also Macias,* 495 F.3d at 41; *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).

---

[11]    At his deposition, plaintiff testified that he "believe[s]" he "pushed [his grievances regarding the assault] through to the C.O.R.C.," Dkt. No. 80-4 at 106. In response to the defendants' motion, however, plaintiff has abandoned that claim and fails to otherwise dispute Hale's assertion that he did not appeal any grievance regarding the alleged assault to the CORC. *See generally* Dkt. No. 82.

If after addressing that question the court concludes that an administrative remedy such as an internal grievance process is not truly available to an inmate plaintiff, including by reason of actions of prison workers to thwart efforts to file and pursue a grievance, then the exhaustion requirement of the PLRA does not preclude the pursuit of an unexhausted claim in a court of competent jurisdiction. *Ross*, 2016 WL 3128839, at *7-8.

In this case, there is evidence in the record, by way of plaintiff's testimony at his deposition and allegations contained in his verified SAC, that he attempted to file a grievance regarding the use-of-force incident involving defendants Borden, Hahn, Fletcher, and Neale on May 13, 2014. Dkt. No. 14 at 15-16; Dkt. No. 80-4 at 134; *see also* Dkt. No. 82 at 18; Dkt. No. 82-1 at 17-18. Similarly, plaintiff has submitted record evidence that his grievance was intercepted by unidentified corrections officers and never filed with the IGRC at defendant Hahn's instruction, and that defendant Hahn explicitly told plaintiff that his grievance would "'never make it to [the] I.G.R.C.'" Dkt. No. 14 at 16; *see also* Dkt. No. 82 at 18; Dkt. No. 82-1 at 17. Because none of these allegations have been refuted by defendants, it appears that a reasonable factfinder could conclude that administrative remedies were not available to plaintiff with respect to this

claim such that plaintiff is excused from exhausting his excessive force claim against defendants Hahn, Borden, Fletcher, and Neale. Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of this claim.

### 2. Conditions of Confinement Claim, Asserted Against All Defendants

Plaintiff has interposed a conditions of confinement claim based on allegations that while at Upstate, he was (1) required to wear handcuffs and waist restraints during family visits, (2) unable to participate in contact visits, (3) denied prescription medication, (4) unable to complete school work, (5) confined in his cell for twenty-two-and-one-half hours per day, (6) forced to go to the bathroom in the shower and in the presence of his cell mate, and (7) denied access to a doctor for back pain. He also alleges that while in keeplock confinement at Auburn, he was denied one single dinner, as well as recreation, juice with his lunch and dinner, and toilet paper. Dkt. No. 14 at 11-13, 17; *see also* Dkt. No. 82 at 13-15, 20, 24. Defendants seek dismissal of plaintiff's claim asserted against all defendants with respect to the conditions of confinement at Upstate based on plaintiff's alleged failure to exhaust the available administrative

remedies prior to filing this lawsuit.[12] Dkt. No. 80-15 at 15. Defendants again rely on Hale's declaration, in which he concludes that, based on his review of the relevant DOCCS records, plaintiff has never appealed any grievance to the CORC with respect to the conditions of confinement of which he complains while incarcerated at Upstate. Dkt. No. 80-6 at 5. In response, plaintiff admits to never having filed a grievance regarding this issue, but contends he did not do so because "a disciplinary disposition is not grieveable." Dkt. No. 82-1 at 20; *see also* Dkt. No. 82 at 25. Even assuming this is true, however, plaintiff's Eighth Amendment conditions of confinement claim with respect to his confinement at Upstate is independent from the disciplinary disposition that caused him to be incarcerated at Upstate. Plaintiff's SAC alleges that his constitutional rights were violated based on the conditions of his confinement in the SHU, including certain restraints he was required to wear during family visits, being denied access to medical care, and "consta[]nt confinement in a cell[.]" Dkt. No. 14 at 17. Because there is no evidence in the record that plaintiff filed a grievance with respect to this claim, and he has offered no excuse for his failure to do so, I recommend that it be dismissed.

---

[12]     Defendants do not seek dismissal of plaintiff's conditions of confinement claim regarding his allegations at Auburn on exhaustion grounds, Dkt. No. 80-15 at 15, and have submitted evidence that plaintiff filed an appeal to the CORC with respect to that claim. Dkt. No. 80-6 at 3; Dkt. No. 80-9 at 4.

### 3. Retaliation Claim, Asserted Against Defendant Murray Regarding Two Separate Incidents

Plaintiff asserts retaliation claims against defendant Murray based on a series of distinct allegations. *See generally* Dkt. No. 14. Arguing that plaintiff has failed to exhaust the available administrative remedies prior to filing this action, defendants seek dismissal of the claims arising from allegations that defendant Murray retaliated against plaintiff for filing grievances against him by (1) denying plaintiff access to the law library in or around November and December 2013, and (2) issuing plaintiff a false misbehavior report on December 26, 2013. Dkt. No. 80-15 at 15-16. According to defendants, there are no DOCCS records demonstrating that plaintiff filed an appeal to the CORC regarding either of these alleged retaliatory acts by defendant Murray. *Id.*; Dkt. No. 80-6 at 5. In response, plaintiff merely alleges that he filed grievances complaining of the misbehavior report issued on December 26, 2013, Dkt. No. 82 at 13, but has submitted no evidence in support of this contention, and does not allege either that he appealed the grievance to the CORC or his efforts to pursue the grievance were thwarted, making the IGP unavailable to him for purposes of satisfying the PLRA's exhaustion requirement.

With respect to defendant Murray's alleged refusal to permit plaintiff access to the law library in or around December 2013, plaintiff alleges he

attempted to file a grievance "but was rebuffed[.]" *Id.* at 10; *see also* Dkt. No. 82-1 at 15. Plaintiff provides no other details regarding this allegation, including who deterred his efforts in filing a grievance and when he attempted to file the grievance. *See, e.g.,* Dkt. No. 82-1 at 15 ("Auburn C.F. grievance office refused to acknowledge a vast majority of plaintiff's grievances making it impossible to Appeal to CORC."). Aside from plaintiff's bare contentions, there is no other record evidence supporting plaintiff's position that he exhausted available administrative remedies prior to filing this lawsuit. Accordingly, I recommend that plaintiff's retaliation claims asserted against defendant Murray be dismissed to the extent they are based on allegations that defendant Murray denied him access to the law library in or around November and December 2013, and issued him a false misbehavior report on December 26, 2013.

C.    Claims Asserted Against Defendant Graham: Personal Involvement

Liberally construed, plaintiff's SAC asserts retaliation and conditions of confinement causes of action against defendant Graham, based exclusively upon his supervisory role. Dkt. No. 14 at 21. Defendants contend these claims are subject to dismissal because there is no record evidence that defendant Graham was personally involved in the allegations giving rise to them. Dkt. No. 80-15 at 17-18.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 622, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

It is well-established that a supervisor, like defendant Graham, cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish

responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Turning first to plaintiff's conditions of confinement claim asserted against defendant Graham, there is no evidence in the record that defendant Graham, who is the superintendent at Auburn, ever became aware of the conditions that form the basis for plaintiff's Eighth Amendment cause of action. In particular, plaintiff complains that, while at Auburn, he was subjected to cruel and unusual punishment when he was denied dinner on December 26, 2013 by defendant Murray and Corrections Officer French, and, while confined in keeplock for twenty-three days beginning on December 26, 2013, as a result of a misbehavior

report issued to him by defendant Murray, he was deprived of beverages with his meals, toilet paper, and recreation. Dkt. No. 14 at 10-13; Dkt. No. 82 at 14. Plaintiff maintains that he complained to defendant Graham about those matters, but defendant Graham did nothing to rectify them. *See*, *e.g.*, Dkt. No. 14 at 12 (alleging that plaintiff "filed a grievance and a complaint with defendant [H]arold D. Graham and Inmate Grievance. . ., Defendant Graham received carbon [c]opies of all Grievances apart of hand written complaint filed"); Dkt. No. 80-4 at 123-27 (testifying at his deposition that he spoke to defendant Graham on an unspecified date about being denied juice and toilet paper while in keeplock and that defendant Graham was aware of the same issues by way of other unspecified prisoners' grievances); Dkt. No. 82 at 15 ("Plaintiff states that defendant Graham was aware of . . . the denial of beverages with Keeplock dinner and Lunch meals through two in person interview [sic] with plaintiff, previous grievance, plaintiff's letters and carbon copies of grievances he filed at AUB, daily meetings with senior members of his staff including AUB grievance supervisor where plaintiff and other inmates grievances were discussed, family phone calls, and consciously chose to turn the blind ratifying the misconduct.").

Even drawing all inferences in favor of plaintiff, the record contains no evidence from which a reasonable factfinder could conclude that defendant Graham learned of the alleged unconstitutional conditions of plaintiff's keeplock confinement at a time when he could remedy them. In particular, plaintiff has failed to identify a specific date on which he spoke to defendant Graham, and there is no independent evidence, aside from plaintiff's vague allegations, that defendant Graham learned of the conditions of which plaintiff complains through a grievance filed by plaintiff or another inmate at Auburn. Indeed, at his deposition, plaintiff could not even recall clearly whether he specifically told defendant Graham that he had been denied juice while in keeplock. Dkt. No. 80-4 at 125. Although plaintiff indicated at his deposition that he hoped to learn, through discovery, the specific grievances filed by other inmates that put defendant Graham on notice that inmates were being denied toilet paper while in keeplock, Dkt. No. 80-4 at 126-27, in response to defendants' motion, plaintiff has submitted no evidence in this regard. Accordingly, because there is no evidence, aside from plaintiff's vague and conclusory allegations, that defendant Graham became aware of the alleged unconstitutional conditions of plaintiff's keeplock confinement in and around December 2013 at a time when defendant Graham could have

28

remedied the conditions, I recommend that plaintiff's conditions of confinement claim as asserted against defendant Graham be dismissed for lack of personal involvement.

Turning next to plaintiff's retaliation cause of action, the record evidence is similarly limited regarding defendant Graham's personal involvement. Plaintiff's verified SAC alleges as follows:

> Defendant [H]arold D. Graham was on notice regarding retaliatory actions by [defendant Murray] through Plaintiffs [sic] grievances, a letter from central office, in person by plaintiff during his rounds of [Auburn] on January 15, 2014, and February 19,2014 Mr. [G]raham stated ' When I get around to it I'll check it out' ' Nothings [sic] going to change, I'm busy with the violence here[.]'

Dkt. No. 14 at 21. In response to defendants' motion, plaintiff has not provided the court with any additional evidence that defendant Graham became aware of any of defendant Murray's alleged retaliatory conduct. Dkt. No. 82 at 13, 15. Instead, plaintiff reiterates the same allegations and cites to the SAC for support. *Id.* Assuming plaintiff did speak with defendant Graham in January and February 2014, by that time defendant Murray had already engaged in all of the alleged retaliatory conduct of which plaintiff complains in this matter. Indeed, the last allegedly retaliatory act by defendant Murray occurred in late-December 2014, when he issued plaintiff a false misbehavior report. Accordingly, even assuming that (1)

defendant Murray's issuance of the misbehavior report violated plaintiff's constitutional rights and (2) defendant Graham learned of this incident on January 15, 2014, those circumstances are insufficient to implicate defendant Graham in a retaliation claim based on his supervisory capacity because he did not learn of the constitutional violation at a time when he could intervene and correct it. *See, e.g., Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013) ("A supervisory official may be liable in an action brought under § 1983 if he exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." (quotation marks and emphasis omitted)). For this reason, I recommend that plaintiff's retaliation claim as asserted against defendant Graham be dismissed for lack of personal involvement.

    D.    <u>Plaintiff's Conditions of Confinement Claim</u>

As noted above in part III.B.2. of this report, plaintiff has asserted a conditions of confinement claim under the Eighth Amendment with respect to his keeplock confinement at Auburn and his incarceration at Upstate. Dkt. No. 14 at 11-13, 17, 21. Since its initial review of plaintiff's complaint, in which the court noted that "it is not precisely clear which named-defendant in this action is responsible for the conditions of confinement challenged in [plaintiff's SAC]," Dkt. No. 16 at 14, plaintiff has clarified his

allegations regarding some of the responsible individuals implicated in these claims. Specifically, plaintiff claims that Corrections Officer French and an unidentified "A-2 Company officer" denied him dinner at Auburn on December 26, 2013, Dkt. No. 82 at 12; *see also* Dkt. No. 80-4 at 84, and that it was Corrections Officer Lane who denied him toilet paper on or about January 10, 2014, Dkt. No. 82 at 14; *see also* Dkt. No. 80-4 at 66. Because these individuals are not named defendants, and plaintiff has never attempted to join them in this action, any Eighth Amendment claim based on those allegations should be dismissed.

With respect to plaintiff's allegations regarding the denial of beverages and recreation while confined in keeplock at Auburn, as well as the conditions of his confinement at Upstate, there is no record evidence from which a reasonable factfinder could conclude that any of the named defendants were personally involved in those deprivations. In response to this argument by defendants, plaintiff vaguely and conclusorily contends "that defendant's [sic] knowingly subjected him to a well known . . . const. violations as retaliation, and instigated other action by non-parties against plaintiff, which amounted to a condition of confinement claim[.]" Dkt. No. 82 at 27. This comprises plaintiff's entire response to defendants' argument that there is no record evidence to support a finding of personal

involvement on the part of any of the defendants regarding plaintiff's conditions of confinement claims. *See, e.g.,* Dkt. No. 80-4 at 60 (plaintiff testifying at his deposition that he "can't pinpoint a specific individual" that denied him juice during his keeplock confinement). To the extent plaintiff attempts to prove that one or more of the defendants was personally involved in the alleged unconstitutional conditions of confinement at Auburn or Upstate based on their involvement in a separate cause of action,[13] such bootstrapping is unavailing and does not give rise to a

---

[13]     For example, plaintiff attempts to demonstrate the personal involvement of defendant Murray in the conditions of confinement claim regarding his keeplock confinement at Auburn by reiterating his allegations that defendant Murray falsely issued the misbehavior report that resulted in the disciplinary confinement. *See* Dkt. No. 80-4 at 61 ("Q. Which – which officers named in this complaint that you filed do you claim are responsible for not getting you beverages while on keep-lock? A. I'm going to say although not properly articulated within the complaint, I'm going to say that that fell within – I'm going to say Officer Murray, you know, and -- based on the comment that Officer French made when he walked into the search area when I was being frisked and said, isn't this the dickhead that grieved you, and I subsequently am denied juice . . ., I'm going to say – I'm going to tie that to them."); Dkt. No. 82 at 13 ("Plaintiff states that the constellation of deprivations Supra, he endured were pure retaliation instigated by defendant Murray, and were the direct result of plaintiff's complaint against him[.]"). Similarly, plaintiff claims that defendants Hahn and Wright are personally involved in the conditions of confinement claim regarding his incarceration at Upstate because defendant Hahn directed defendant Wright to issue the misbehavior report to plaintiff in retaliation for filing grievances against him. Dkt. No. 80-4 at 120-21. Those actions that precipitated disciplinary proceedings leading to the challenged confinement are too attenuated from the conditions experienced during the resulting disciplinary confinement to support an Eighth Amendment claim against those defendants. *Booker v Maly, et al.*, 12-CV-0246, 2014 WL 1289579, 2014 U.S. Dist. LEXIS 44086, *48-*49 (N.D.N.Y. Mar. 6, 2014) (Baxter, M.J.) ("[T]o the extent that plaintiff blames defendants Maly, Smith, Prack, and Fischer for the SHU conditions only to the extent that they were involved in the disciplinary hearing at or its review, any Eighth Amendment claim regarding the subsequent SHU conditions may be dismissed because there is no allegation that any of the three defendants were personally involved in maintaining the conditions in SHU or expected plaintiff to be subjected to

genuine dispute of material fact as to whether the named defendants took

any part in creating the conditions of which plaintiff now complains.

Accordingly, I recommend plaintiff's conditions of confinement claims

arising from his incarceration at Auburn and Upstate be dismissed.

E.    Plaintiff's Retaliation Claims

Plaintiff's SAC asserts several retaliation claims against the

defendants. *See generally* Dkt. No. 14; *see also* Dkt. No. 80-4 at 15.

Defendants have identified and seek dismissal of seven of those claims

based on the absence of any record evidence from which a reasonable

factfinder could conclude that any of the named defendants took adverse

action against plaintiff in retaliation for engaging in protected activity. Dkt.

No. 80-15 at 21.

A cognizable section 1983 retaliation claim lies when prison officials

take adverse action against an inmate that is motivated by the inmate's

exercise of a constitutional right, including the free speech provisions of

the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir.

---

anything more than the 'normal' conditions in SHU.") , report and recommendation
adopted by 2014 U.S. Dist. LEXIS 44640 (N.D.N.Y. Mar. 31, 2014); *Dixon v. Goord*,
224 F.Supp.2d 739, 751-752 (S.D.N.Y.2002) (dismissing based on lack of personal
involvement inmate's Eighth Amendment conditions-of-confinement claim against
guards who were involved in an altercation with the plaintiff and officer presiding over
disciplinary hearing that resulted in the plaintiff's confinement in a special housing unit
at a different facility); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (personal
involvement in the violation required to establish liability under section 1983).

2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To succeed on a section 1983 claim for retaliatory conduct, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3,

2003) (Sharpe, M.J.). These well-established principles inform analysis of seven claims defendants contend are ripe for dismissal, as follows:

### 1. Defendant Murray Threatened to Place a Weapon on Plaintiff

Plaintiff's SAC alleges that he filed a "complaint" with the superintendent at Downstate "for prison conditions" on or around July 31, 2013. Dkt. No. 14 at 7. Plaintiff contends that in or around September 2013, defendant Murray, threatened to place a weapon on his person while plaintiff was proceeding to the law library. *Id.* at 7-8. To the extent that his SAC could be construed as asserting a retaliation claim against defendant Murray, who is employed at Auburn, based on allegations that he threatened plaintiff in retaliation for filing the grievance at Downstate, I recommend the claim be dismissed. As defendants highlight, at his deposition plaintiff admitted that (1) defendant Murray did not retaliate against plaintiff for the grievance he filed at Downstate; and (2) at the time defendant Murray allegedly threatened plaintiff, he never mentioned the Downstate grievance. Dkt. No. 80-4 at 25-26. Accordingly, I recommend this retaliation claim be dismissed.

### 2. Defendant Murray Denied Plaintiff Access to the Law Library

Plaintiff asserts a retaliation claim against defendant Murray based on allegations that, in retaliation for plaintiff filing a grievance against defendant Murray regarding his threat to place a weapon on plaintiff in or around September 2013, defendant Murray denied plaintiff access to the law library on twelve occasions in or about November and December 2013. Dkt. No. 14 at 8-9; Dkt. No. 80-4 at 27-29. As was discussed in part III.B.3. of this report, I have recommended that this claim be dismissed as unexhausted. For this reason, I have not analyzed the merits of this cause of action.

3.      Defendant Murray Issued Plaintiff a False Misbehavior Report

Plaintiff also contends that defendant Murray retaliated against him for filing the grievance regarding defendant Murray's alleged threats to plant a weapon on him by issuing him a false misbehavior report on or about December 26, 2013. Dkt. No. 14 at 12; Dkt. No. 80-4 at 56. In particular, plaintiff alleges that on that date Officer French placed plaintiff on keeplock status after referencing plaintiff's grievance against defendant Murray, and on that day or the next, defendant Murray issued plaintiff an allegedly false misbehavior report that resulted in plaintiff's continued keeplock confinement for twenty-three days. Dkt. No. 14 at 11-12; Dkt. No. 80-4 at 56, 65.

As was discussed in part III.B.3. of this report, I have recommended that this claim be dismissed as unexhausted. For this reason, I similarly have not analyzed the merits of this cause of action.

4.    <u>Defendant Hahn Placed Plaintiff on Investigation Status</u>

Plaintiff alleges in his SAC that on or about May 3, 2014, defendant Hahn placed him on seventy-two hour investigation status because the braids in his hair did not comply with facility standards. Dkt. No. 14 at 14. The court does not now, and did not at the time of its initial review of plaintiff's SAC pursuant to 28 U.S.C. § 1915A, construe this allegation to give rise to a retaliation claim against defendant Hahn. Dkt. No. 16 at 10. In addition, plaintiff testified at his deposition that he does not believe defendant Hahn was motivated by retaliatory animus when he placed Gomez on investigation status indicating his belief that it was an isolated incident. Dkt. No. 80-4 at 81. Accordingly, to the extent that the SAC is construed to raise a retaliation claim regarding these allegations, I recommend that it be dismissed.

5.    <u>Claim That Defendant Hahn Threatened Plaintiff on May 10, 2014</u>

According to the plaintiff, following his encounter with defendant Hahn on May 3, 2014, during which defendant Hahn placed Gomez on seventy-two hour investigation status, plaintiff filed a grievance regarding

the incident. Dkt. No. 14 at 14; Dkt. No. 80-4 at 78-79. Less than one week later, defendant Hahn allegedly walked into plaintiff's housing unit with a copy of the grievance and threatened plaintiff with bodily harm if he pursued it. Dkt. No. 14 at 14; Dkt. No. 80-4 at 78-79, 81.

Defendants do not argue that the record lacks evidence from which a reasonable factfinder could conclude that plaintiff engaged in protected activity by filing a grievance against defendant Hahn. *See, e.g., Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001). Defendants contend, however, that defendant Hahn's alleged threat of bodily harm to plaintiff is not sufficient to satisfy the adverse action element of a retaliation claim. Dkt. No. 50-15 at 22. While there is some case law in this circuit to suggest that whether a verbal threat would deter a similarly situated inmate from engaging in protected activity depends on the specificity of the threat, *see, e.g., Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) ("Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered."), the Second Circuit criticized this reasoning relatively recently in an unpublished decision, *Ford v. Palmer*, 539 F. App'x 5, 7 (2d Cir. 2013). In *Ford*, the court concluded that the district court "erred in reasoning, as a

matter of law, that verbal threats must be more definite and specific than [the defendant's] alleged threat in order to constitute 'adverse action.'" *Ford*, 539 F. App'x at 7. In that case, the plaintiff had submitted record evidence that the defendant had threatened to poison plaintiff by putting "'some kind of substance in plaintiff's hot water'" in retaliation for filing a grievance against him. *Id.* (quoting the plaintiff's amended complaint). The Second Circuit noted that "the vague nature of the alleged threat – *i.e.*, not telling [the plaintiff] when or how [the defendant] planned to poison him – could have enhanced the effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing additional grievances." *Id.*

In light of *Ford*, I am unable to recommend dismissal of plaintiff's retaliation claim in this instance. Plaintiff testified at his deposition that defendant Hahn told him that, if he proceeded with his grievance "in any way, shape or form[,] . . . that [plaintiff] was going to be hurt." Dkt. No. 80-4 at 81; *see also* Dkt. No. 14 at 14. Drawing all inferences in favor of plaintiff, I find that, if plaintiff's testimony is credited, a reasonable factfinder could conclude that defendant Hahn's threat was sufficient to deter a person of ordinary firmness from filing any further grievances. Indeed, although not determinative in its own right, plaintiff testified that, immediately following

defendant Hahn's alleged threat, he told defendant Hahn that he would withdraw his grievance and did, in fact, withdraw the grievance when interviewed by corrections staff. Dkt. No. 14 at 15; Dkt. No. 80-4 at 81-82. Moreover, in light of the close temporal proximity between when plaintiff allegedly filed his grievance (on or about May 4, 2014, Dkt. No. 80-4 at 79) and the time that defendant defendant Hahn allegedly threatened plaintiff (on or about May 10, 2014, Dkt. No. 14 at 14), and the fact that defendants have submitted no evidence suggesting that plaintiff's allegations are false, I find there is sufficient record evidence from which a reasonable factfinder could discern a causal connection between plaintiff's protected activity and the alleged adverse action. Accordingly, I recommend that defendants' motion for summary judgment be denied to the extent it seeks dismissal of this claim against defendant Hahn.

> 6. Defendants Neale, Borden, Fletcher, and Hahn Used Excessive Force Against Plaintiff

Plaintiff alleges that defendants Neale, Borden, Fletcher, and Hahn assaulted him on or about May 13, 2014, in retaliation for plaintiff filing a grievance against defendant Hahn earlier in the month. Dkt. No. 14 at 15. Defendants contend that this claim is subject to dismissal as against defendants Neale, Borden, and Fletcher because there is no record evidence that those individuals were aware of the grievance plaintiff filed

against defendant Hahn on or about May 4, 2014. Dkt. No. 80-15 at 23.

Defendants' argument, however, ignores plaintiff's allegation that,

immediately following the assault and in the presence of the other

defendants, defendant Hahn instructed plaintiff to "'stop filing stupid

grievance papers[.]'" Dkt. No. 14 at 15; *see also* Dkt. No. 80-4 at 87. This

allegation provides sufficient circumstantial evidence to give rise to a

genuine dispute of material fact as to whether defendants Neale, Borden,

and Fletcher knew of the grievance before allegedly assaulting Gomez.

Defendants argue that a cognizable retaliation claim does not lie

"where the only alleged protected activity is an unrelated grievance about

another officer." Dkt. No. 80-15 at 23. The fact that the defendants who

allegedly retaliated against the plaintiff were not the subject of the

grievance that is claimed to have precipitated the assault does not

necessarily negate the possibility that a reasonable factfinder could

conclude that the two are linked. *See, e.g., Bennett v. Goord*, 343 F.3d

133, 138-39 (2d Cir. 2003) (reversing the district court where the record

evidence gave rise to a dispute of material fact regarding whether the

defendants retaliated against the plaintiff for the ongoing settlement

discussions occurring in a different lawsuit involving different named

defendants). Because I find that a reasonable factfinder could conclude,

based on the record evidence, that defendants Neale, Borden, and Fletcher engaged in the alleged assault on plaintiff in retaliation for the grievance he filed against defendant Hahn less than two weeks prior to the assault, I recommend that defendants' motion be denied as to this claim.

7.     Defendant Wright Conducted a Search and Issued a Misbehavior Report

Plaintiff has alleged that he at least attempted to file a grievance against the defendants involved in the above-described assault on or around May 13, 2014. Dkt. No. 14 at 15-16. According to plaintiff, defendant Hahn told plaintiff on May 14, 2014, that the grievance would "never make it to [the] I.G.R.C." *Id.* at 16. On May 15, 2014, defendant Wright conducted a search of plaintiff's area, and, at the conclusion of the search, defendant Hahn allegedly instructed defendant Wright to issue plaintiff a false misbehavior "report for a disturbance, and placed plaintiff on Full bed status pending a hearing."[14] *Id.* Liberally construed, plaintiff's SAC asserts that defendant Hahn instructed defendant Wright to issue the allegedly false misbehavior report in retaliation for filing a grievance against him regarding the assault on May 13, 2014. Dkt. No. 80-4 at 116.

---

[14]     At his deposition plaintiff described "full bed status" as "keep-lock status," to mean that he was required to "stay in [his] cube" pending a disciplinary hearing. Dkt. No. 80-4 at 111-12.

There is no record evidence from which a reasonable factfinder could conclude that defendant Wright was aware of either the grievances plaintiff had previously filed against defendant Hahn or the history of conflict between defendant Hahn and the plaintiff. Indeed, at plaintiff's deposition, he admitted that he did not know whether defendant Wright knew of the grievances he had filed against defendant Hahn at the time he issued plaintiff the misbehavior report. Dkt. No. 80-4 at 116. In support of defendants' motion, defendant Wright has filed a declaration in which he attests that he did not issue the misbehavior report to plaintiff in retaliation for "any previously filed grievances." Dkt. No. 80-13 at 2. Because there is no evidence in the record that contradicts this assertion and reflects that defendant Wright knew of the grievances plaintiff previously filed against defendant Hahn, I recommend that defendants' motion for summary judgment be granted to the extent it seeks dismissal of plaintiff's retaliation claim asserted against defendant Wright.

F.    Qualified Immunity

In the event the above recommendations are adopted by the assigned district judge, the following causes of action remain for consideration: (1) plaintiff's excessive force claim, asserted against defendants Hahn, Neale, Borden, and Fletcher; (2) plaintiff's retaliation

claim, asserted against defendant Hahn based on allegations that he threatened plaintiff with bodily harm in retaliation for plaintiff filing a grievance against him regarding the incident on May 3, 2014 at Adirondack; (3) plaintiff's retaliation claim, asserted against defendants Hahn, Neale, Borden, and Fletcher based on allegations that they assaulted him in retaliation for filing a grievance against defendant Hahn regarding the incident on May 3, 2014; and (4) plaintiff's retaliation claim, asserted against defendant Hahn based on allegations that defendant Hahn instructed defendant Wright to issue plaintiff a false misbehavior report out of retaliatory animus for plaintiff filing a grievance against him regarding the alleged assault on May 13, 2014. In their motion, defendants have included what can fairly be described as a conclusory, *pro forma* request for the dismissal of these remaining claims based on the doctrine of qualified immunity. *See* Dkt. No. 80-15 at 25 ("On this record, for all the reasons outlined above, it is clear that Defendants acted reasonably and are entitled to summary judgment on the ground of qualified immunity."). Notwithstanding defendants' failure to include any legal analysis or citation to the record evidence in support of their argument, I have proceeded to analyze whether any of the named defendants are entitled to qualified immunity from suit with respect to the remaining causes of action.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70

(2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this case, defendants seek the protection of qualified immunity based solely upon their contention that they acted reasonably. Dkt. No. 80-15 at 25. Having considered the record now before the court, and drawing all inferences in favor of plaintiff, *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014), I find that the record gives rise to several genuine disputes of material fact with respect to each of the remaining claims that preclude me from recommending dismissal of them at this juncture.

Turning first to plaintiff's excessive force claim asserted against defendants Hahn, Neale, Borden, and Fletcher, defendants have submitted no evidence that they did *not* assault plaintiff, as plaintiff alleges. Assuming a reasonable factfinder credits plaintiff's testimony regarding the alleged assault on or about May 13, 2014, there is no basis to conclude that any of the defendants implicated in this cause of action had any reason to believe their conduct did not violate plaintiff's constitutional rights.

Similarly, with respect to plaintiff's retaliation claim asserted against defendants Hahn, Neale, Borden, and Fletcher, there is sufficient circumstantial evidence from which a reasonable factfinder could conclude that each of these individuals was aware of the grievance plaintiff filed against defendant Hahn less than two weeks prior to the alleged assault. Specifically, immediately following the assault, and in the presence of defendants Neale, Borden, and Fletcher, defendant Hahn allegedly instructed plaintiff to stop filing grievances. *See, e.g,* Dkt. No. 80-4 at 87. Reasonable factfinders could impute defendant Hahn's prior knowledge of the grievance to defendants Neale, Borden, and Fletcher, especially in light of the close temporal proximity between plaintiff's filing of the grievance on or about May 4, 2014, and the assault, which allegedly occurred on or about May 13, 2014. Dkt. No. 14 at 14-15; Dkt. No. 80-4 at 79, 85-88. Moreover, plaintiff testified that, prior to the assault, he had not encountered any conflicts with defendants Borden, Neale, or Fletcher. Dkt. No. 80-4 at 92. The absence of a history of any conflict with these individuals – and, therefore, the absence of any independent motivation to assault plaintiff – lends at least some credence to plaintiff's allegation that they were aware of the grievances he had filed previously against defendant Hahn. While defendants contend in their memorandum of law

that "there is no evidence that [defendants] Neale, Fletcher, or Borden were retaliating," and rely on plaintiff's admission that "he had no prior issues" with these individuals, Dkt. No. 80-15 at 23, this only underscores the competing record evidence with respect to whether a reasonable factfinder could conclude that there is a sufficient causal connection between plaintiff's grievance filed against defendant Hahn and the use of force exerted towards plaintiff by defendants Neale, Borden, and Fletcher. Assuming a factfinder credits plaintiff's version of the events and concludes that defendants Neale, Borden, and Fletcher were aware of the earlier grievance plaintiff had filed against defendant Hahn and assaulted him in retaliation for having filed the grievance, reasonable officers in their position would not believe their actions to be constitutional.

Turning to plaintiff's remaining retaliation claims, asserted against defendant Hahn, defendants have not submitted any evidence that discredits plaintiff's allegations that defendant Hahn retaliated against him for filing grievances by threatening him with bodily harm or instructing defendant Wright to issue plaintiff a false misbehavior report. Accordingly, assuming a reasonable factfinder credits plaintiff's testimony with respect to these claims, no officer in defendant Hahn's position would reasonably believe that his conduct was constitutional.

For the foregoing reasons, I recommend the court deny defendants' motion for summary judgment to the extent it seeks dismissal of plaintiff's remaining claims on the basis of qualified immunity.

## G. Eleventh Amendment Immunity

In the last point of their motion, defendants seek dismissal of any cause of action seeking money damages asserted against them in their official capacities as precluded by the Eleventh Amendment. Dkt. No. 80-15 at 25-26.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability, which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. *See, e.g., Daisernia v. State of N.Y.*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted

against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of N.Y. App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (*citing, inter alia, Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named-defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that, to the extent that any of the claims contained within plaintiff's SAC are asserted against any of the named-defendants in their official capacities, those claims be dismissed with prejudice.

IV.     SUMMARY AND RECOMMENDATION

Defendants seek dismissal of all of plaintiff's claims set forth in the plaintiff's SAC based on a variety of grounds, both procedural and substantive. While some of plaintiff's causes of action are subject to

dismissal either on the basis of failure to exhaust or on the merits, others are not and remain for trial. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED in part and DENIED in part, as follows:

(1)   Plaintiff's conditions of confinement claim regarding the conditions he experienced at Upstate and Auburn should be dismissed;

(2)   Plaintiff's retaliation claims asserted against defendant Murray with respect to the allegations that defendant Murray threatened to place a weapon on plaintiff, denied plaintiff access to the law library, and issued plaintiff a false misbehavior report should be dismissed;

(3)   Plaintiff's retaliation and conditions of confinement claims asserted against defendant Graham should be dismissed;

(4)   Plaintiff's conditions of confinement claim asserted against all defendants should be dismissed;

(5)   Plaintiff's retaliation claim asserted against defendant Hahn based on allegations that he placed plaintiff on seventy-two hour investigation status in retaliation for filing a grievance should be dismissed; and

(6)     Plaintiff's retaliation claim asserted against defendant Wright

        based on allegations that he filed a false misbehavior report

        against plaintiff in retaliation for plaintiff's grievance filed

        against defendant Hahn should be dismissed; and it is further

RECOMMENDED that all claims against defendants Murray,

Graham, and Wright be dismissed; and it is further

RECOMMENDED that, if the above recommendations are accepted,

the following causes of action remain for trial: (1) plaintiff's excessive force

claim, asserted against defendants Hahn, Neale, Borden, and Fletcher; (2)

plaintiff's retaliation claim, asserted against defendant Hahn based on

allegations that he threatened plaintiff with bodily harm in retaliation for

plaintiff filing a grievance against him regarding the incident on May 3,

2014 at Adirondack; (3) plaintiff's retaliation claim, asserted against

defendants Hahn, Neale, Borden, and Fletcher based on allegations that

they assaulted him in retaliation for his filing of a grievance against

defendant Hahn regarding the incident on May 3, 2014; and (4) plaintiff's

retaliation claim, asserted against defendant Hahn based on allegations

that defendant Hahn instructed defendant Wright to issue plaintiff a false

misbehavior report out of retaliatory animus for plaintiff having filed a

grievance against him regarding the alleged assault on May 13, 2014.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     June 16, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, http://www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A.-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

### a. Whether administrative remedies were "available" to Hargrove

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, see *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⚷ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y.Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

*5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

***ORDER and REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

I. BACKGROUND

A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,FN1 the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.FN2

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN3 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN4 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN5

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true FN6 to the extent that (1) those facts are supported by the evidence in the record,FN7 and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.FN8

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[781 F.2d 319, 323-324 (2d Cir.1986)](setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007)* (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (Id.) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (Id.)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with

prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998).*

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (Id. at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (Id. at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (Id. at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.<u>FN28</u> (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**\*11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Affid. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at \*27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at \*24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent* injury to his wrist. (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at \*11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminately [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims. [FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") [FN63]

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED*** **in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED*** **in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ROSS *v.* BLAKE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 15–339.   Argued March 29, 2016—Decided June 6, 2016

Two guards—James Madigan and petitioner Michael Ross—undertook to move respondent Shaidon Blake, a Maryland inmate, to the prison's segregation unit.  During the transfer, Madigan assaulted Blake, punching him several times in the face.  Blake reported the incident to a corrections officer, who referred the matter to the Maryland prison system's Internal Investigative Unit (IIU).  The IIU, which has authority under state law to investigate employee misconduct, issued a report condemning Madigan's actions.  Blake subsequently sued both guards under 42 U. S. C. §1983, alleging excessive force and failure to take protective action.  A jury found Madigan liable.  But Ross raised (as an affirmative defense) the exhaustion requirement of the Prison Litigation Reform Act of 1995 (PLRA), which demands that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions.  §1997e(a). Ross argued that Blake had filed suit without first following the prison's prescribed procedures for obtaining an administrative remedy, while Blake argued that the IIU investigation was a substitute for those procedures.  The District Court sided with Ross and dismissed the suit.  The Fourth Circuit reversed, holding that "special circumstances" can excuse a failure to comply with administrative procedural requirements—particularly where the inmate reasonably, even though mistakenly, believed he had sufficiently exhausted his remedies.

*Held*:

  1. The Fourth Circuit's unwritten "special circumstances" exception is inconsistent with the text and history of the PLRA.  Pp. 3–8.

    (a) The PLRA speaks in unambiguous terms, providing that "[n]o

action shall be brought" absent exhaustion of available administra-
tive remedies. §1997e(a). Aside from one significant qualifier—that
administrative remedies must indeed be "available"—the text sug-
gests no limits on an inmate's obligation to exhaust. That mandatory
language means a court may not excuse a failure to exhaust, even to
take "special circumstances" into account. When it comes to statuto-
ry exhaustion provisions, courts have a role in creating exceptions on-
ly if Congress wants them to. So mandatory exhaustion statutes like
the PLRA establish mandatory exhaustion regimes, foreclosing judi-
cial discretion. See, *e.g., McNeil* v. *United States*, 508 U. S. 106.
Time and again, this Court has rejected every attempt to deviate
from the PLRA's textual mandate. See *Booth* v. *Churner*, 532 U. S.
731; *Porter* v. *Nussle*, 534 U. S. 516; *Woodford* v. *Ngo*, 548 U. S. 81.
All those precedents rebut the Fourth Circuit's "special circumstanc-
es" excuse for non-exhaustion. Pp. 3–6.

　(b) The PLRA's history further underscores the mandatory na-
ture of its exhaustion regime. The PLRA replaced a largely discre-
tionary exhaustion scheme, see *Nussle*, 534 U. S., at 523, removing
the conditions that administrative remedies be "plain, speedy, and ef-
fective," that they satisfy federal minimum standards, and that ex-
haustion be "appropriate and in the interests of justice." The Court
of Appeals' exception, if applied broadly, would resurrect that discre-
tionary regime, in which a court could look to all the particulars of a
case to decide whether to excuse a failure to exhaust. And if the ex-
ception were confined to cases in which a prisoner makes a reasona-
ble mistake about the meaning of a prison's grievance procedures, it
would reintroduce the requirement that the remedial process be
"plain." When Congress amends legislation, courts must "presume it
intends [the change] to have real and substantial effect." *Stone* v.
*INS*, 514 U. S. 386, 397. But the Court of Appeals acted as though no
amendment had taken place. Pp. 6–8.

　2. Blake's contention that the prison's grievance process was not in
fact available to him warrants further consideration below. Pp. 8–14.

　(a) Blake's suit may yet be viable. The PLRA contains its own,
textual exception to mandatory exhaustion. Under §1997e(a), an in-
mate's obligation to exhaust hinges on the "availab[ility]" of adminis-
trative remedies. A prisoner is thus required to exhaust only those
grievance procedures that are "capable of use" to obtain "some relief
for the action complained of." *Booth*, 532 U. S., at 738.

　As relevant here, there are three kinds of circumstances in which
an administrative remedy, although officially on the books, is not ca-
pable of use to obtain relief. First, an administrative procedure is
unavailable when it operates as a simple dead end—with officers un-
able or consistently unwilling to provide any relief to aggrieved in-

mates.  Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use—*i.e.*, some mechanism exists to provide relief, but no ordinary prisoner can navigate it.  And finally, a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation.  Pp. 8–11.

   (b) The facts of this case raise questions about whether, given these principles, Blake had an "available" administrative remedy to exhaust.  Ross's exhaustion defense rests on Blake's failure to seek relief through Maryland's Administrative Remedy Procedure (ARP) process, which begins with a grievance to the warden.  That process is the standard method for addressing inmate complaints in the State's prisons.  But Maryland separately maintains the IIU to look into charges of prison staff misconduct, and the IIU did just that here.  Blake urged in the courts below that once the IIU commences such an inquiry, a prisoner cannot obtain relief through the ARP process.  And in this Court, the parties have lodged additional materials relating to the interaction between the IIU and the ARP.  Both sides' submissions, although scattershot and in need of further review, lend some support to Blake's account.

   Blake's filings include many administrative dispositions indicating that Maryland wardens routinely dismiss ARP grievances as procedurally improper when parallel IIU investigations are pending.  In addition, Blake has submitted briefs of the Maryland attorney general specifically recognizing that administrative practice.  And Ross's own submissions offer some confirmation of Blake's view: Ross does not identify a single case in which a warden considered the merits of an ARP grievance while an IIU inquiry was underway.  On remand, the Fourth Circuit should perform a thorough review of such materials, and then address whether the remedies Blake did not exhaust were "available" under the legal principles set out here.  Pp. 11–14.

787 F. 3d 693, vacated and remanded.

   KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, ALITO, and SOTOMAYOR, JJ., joined.  THOMAS, J., filed an opinion concurring in part and concurring in the judgment.  BREYER, J., filed an opinion concurring in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 15–339

———————

## MICHAEL ROSS, PETITIONER *v.* SHAIDON BLAKE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 6, 2016]

JUSTICE KAGAN delivered the opinion of the Court.

The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U. S. C. §1997e(a). The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA. But we also underscore that statute's built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not "available." The briefs and other submissions filed in this case suggest the possibility that the aggrieved inmate lacked an available administrative remedy. That issue remains open for consideration on remand, in light of the principles stated below.

## I

Respondent Shaidon Blake is an inmate in a Maryland prison. On June 21, 2007, two guards—James Madigan and petitioner Michael Ross—undertook to move him from his regular cell to the facility's segregation unit. Accord-

ing to Blake's version of the facts, Ross handcuffed him
and held him by the arm as they left the cell; Madigan
followed close behind. Near the top of a flight of stairs,
Madigan shoved Blake in the back. Ross told Madigan he
had Blake under control, and the three continued walking.
At the bottom of the stairs, Madigan pushed Blake again
and then punched him four times in the face, driving his
head into the wall. After a brief pause, Madigan hit Blake
one last time. Ross kept hold of Blake throughout the
assault. And when the blows subsided, Ross helped Madi-
gan pin Blake to the ground until additional officers
arrived.

Later that day, Blake reported the assault to a senior
corrections officer. That officer thought Madigan at fault,
and so referred the incident to the Maryland prison sys-
tem's Internal Investigative Unit (IIU). Under state law,
the IIU has authority to investigate allegations of employee
misconduct, including the use of "excessive force." Code
of Md. Regs., tit. 12, §11.01.05(A)(3) (2006). After conduct-
ing a year-long inquiry into the beating, the IIU issued a
final report condemning Madigan's actions, while making
no findings with respect to Ross. See App. 191–195.
Madigan resigned to avoid being fired.

Blake subsequently sued both guards under 42 U. S. C.
§1983, alleging that Madigan had used unjustifiable force
and that Ross had failed to take protective action. The
claim against Madigan went to a jury, which awarded
Blake a judgment of $50,000. But unlike Madigan, Ross
raised the PLRA's exhaustion requirement as an affirma-
tive defense, contending that Blake had brought suit
without first following the prison's prescribed procedures
for obtaining an administrative remedy. As set out in
Maryland's Inmate Handbook, that process—called, not
very fancifully, the Administrative Remedy Procedure
(ARP)—begins with a formal grievance to the prison's
warden; it may also involve appeals to the Commissioner

of Correction and then the Inmate Grievance Office (IGO).
See Maryland Div. of Correction, Inmate Handbook 30–31
(2007). Blake acknowledged that he had not sought a
remedy through the ARP—because, he thought, the IIU
investigation served as a substitute for that otherwise
standard process. The District Court rejected that expla-
nation and dismissed the suit, holding that "the com-
mencement of an internal investigation does not relieve
prisoners from the [PLRA's] exhaustion requirement."
*Blake* v. *Maynard*, No. 8:09–cv–2367 (D Md., Nov. 14,
2012), App. to Pet. for Cert. 38, 2012 WL 5568940, *5.

The Court of Appeals for the Fourth Circuit reversed in
a divided decision. Stating that the PLRA's "exhaustion
requirement is not absolute," the court adopted an extra-
textual exception originally formulated by the Second
Circuit. 787 F. 3d 693, 698 (2015). Repeated the Court of
Appeals: "[T]here are certain 'special circumstances' in
which, though administrative remedies may have been
available[,] the prisoner's failure to comply with adminis-
trative procedural requirements may nevertheless have
been justified." *Ibid.* (quoting *Giano* v. *Goord*, 380 F. 3d
670, 676 (CA2 2004)). In particular, that was true when a
prisoner "reasonably"—even though mistakenly—
"believed that he had sufficiently exhausted his remedies."
787 F. 3d, at 695. And Blake, the court concluded, fit
within that exception because he reasonably thought that
"the IIU's investigation removed his complaint from the
typical ARP process." *Id.,* at 700. Judge Agee dissented,
stating that the PLRA's mandatory exhaustion require-
ment is not "amenable" to "[j]udge-made exceptions." *Id.,*
at 703. This Court granted certiorari. 577 U. S. ___
(2015).

## II

The dispute here concerns whether the PLRA's exhaus-
tion requirement, §1997e(a), bars Blake's suit. Statutory

text and history alike foreclose the Fourth Circuit's adoption of a "special circumstances" exception to that mandate. But Blake's suit may yet be viable. Under the PLRA, a prisoner need exhaust only "available" administrative remedies. And Blake's contention that the prison's grievance process was not in fact available to him warrants further consideration below.

A

Statutory interpretation, as we always say, begins with the text, see, *e.g., Hardt* v. *Reliance Standard Life Ins. Co.*, 560 U. S. 242, 251 (2010)—but here following that approach at once distances us from the Court of Appeals. As Blake acknowledges, that court made no attempt to ground its analysis in the PLRA's language. See 787 F. 3d, at 697–698; Brief for Respondent 47–48, n. 20 (labeling the Court of Appeals' rule an "extra-textual exception to the PLRA's exhaustion requirement"). And that failure makes a difference, because the statute speaks in unambiguous terms opposite to what the Fourth Circuit said.

Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As we have often observed, that language is "mandatory": An inmate "shall" bring "no action" (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies. *Woodford* v. *Ngo*, 548 U. S. 81, 85 (2006); accord, *Jones* v. *Bock*, 549 U. S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA"). As later discussed, that edict contains one significant qualifier: the remedies must indeed be "available" to the prisoner. See *infra*, at 8–10. But aside from that exception, the PLRA's text suggests no

limits on an inmate's obligation to exhaust—irrespective of any "special circumstances."

And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. See *Miller* v. *French*, 530 U. S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion"). No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. See *McKart* v. *United States*, 395 U. S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. See, *e.g., McNeil* v. *United States*, 508 U. S. 106, 111, 113 (1993) ("We are not free to rewrite the statutory text" when Congress has strictly "bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies"). Time and again, this Court has taken such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements. See, *e.g., id.,* at 111; *Shalala* v. *Illinois Council on Long Term Care, Inc.*, 529 U. S. 1, 12–14 (2000); see also 2 R. Pierce, Administrative Law Treatise §15.3, p. 1241 (5th ed. 2010) (collecting cases).

We have taken just that approach in construing the PLRA's exhaustion provision—rejecting every attempt to deviate (as the Fourth Circuit did here) from its textual mandate. In *Booth* v. *Churner*, 532 U. S. 731 (2001), for example, the prisoner argued that exhaustion was not necessary because he wanted a type of relief that the administrative process did not provide. But §1997e(a), we

replied, made no distinctions based on the particular "forms of relief sought and offered," and that legislative judgment must control: We would not read "exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Id.*, at 741, n. 6. The next year, in *Porter* v. *Nussle*, 534 U. S. 516, 520 (2002), the Court rejected a proposal to carve out excessive-force claims (like Blake's) from the PLRA's exhaustion regime, viewing that approach too as inconsistent with the uncompromising statutory text. And most recently, in *Woodford*, we turned aside a requested exception for constitutional claims. 548 U. S., at 91, n. 2. Our explanation was familiar: "We are interpreting and applying" not a judge-made doctrine but a "statutory requirement," and therefore must honor Congress's choice. *Ibid.*[1] All those precedents rebut the Court of Appeals' adoption of a "special circumstances" excuse for non-exhaustion.

So too, the history of the PLRA underscores the mandatory nature of its exhaustion regime. Section §1997e(a)'s precursor, enacted in the Civil Rights of Institutionalized Persons Act (CRIPA), §7, 94 Stat. 352 (1980), was a "weak exhaustion provision." *Woodford*, 548 U. S., at 84. Under CRIPA, a court would require exhaustion only if a State provided "plain, speedy, and effective" remedies meeting federal minimum standards—and even then, only if the court believed exhaustion "appropriate and in the inter-

---

[1] We note that our adherence to the PLRA's text runs both ways: The same principle applies regardless of whether it benefits the inmate or the prison. We have thus overturned judicial rulings that imposed extra-statutory limitations on a prisoner's capacity to sue—reversing, for example, decisions that required an inmate to demonstrate exhaustion in his complaint, permitted suit against only defendants named in the administrative grievance, and dismissed an entire action because of a single unexhausted claim. See *Jones* v. *Bock*, 549 U. S. 199, 203 (2007). "[T]hese rules," we explained, "are not required by the PLRA," and "crafting and imposing them exceeds the proper limits on the judicial role." *Ibid.*

ests of justice." §7(a), 94 Stat. 352. That statutory scheme made exhaustion "in large part discretionary." *Nussle*, 534 U. S., at 523. And for that reason (among others), CRIPA proved inadequate to stem the then-rising tide of prisoner litigation. In enacting the PLRA, Congress thus substituted an "invigorated" exhaustion provision. *Woodford*, 548 U. S., at 84. "[D]iffer[ing] markedly from its predecessor," the new §1997e(a) removed the conditions that administrative remedies be "plain, speedy, and effective" and that they satisfy minimum standards. *Nussle*, 534 U. S., at 524. Still more, the PLRA prevented a court from deciding that exhaustion would be unjust or inappropriate in a given case. As described earlier, see *supra,* at 4–5, all inmates must now exhaust all available remedies: "Exhaustion is no longer left to the discretion of the district court." *Woodford*, 548 U. S., at 85.

The PLRA's history (just like its text) thus refutes a "special circumstances" exception to its rule of exhaustion. That approach, if applied broadly, would resurrect CRIPA's scheme, in which a court could look to all the particulars of a case to decide whether to excuse a failure to exhaust available remedies. But as we have observed, such wide-ranging discretion "is now a thing of the past." *Booth*, 532 U. S., at 739. And the conflict with the PLRA's history (as again with its text) becomes scarcely less stark if the Fourth Circuit's exception is confined, as the court may have intended, to cases in which a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures. Understood that way, the exception reintroduces CRIPA's requirement that the remedial process be "plain"—that is, not subject to any reasonable misunderstanding or disagreement. §7(a), 94 Stat. 352. When Congress amends legislation, courts must "presume it intends [the change] to have real and substantial effect." *Stone* v. *INS*, 514 U. S. 386, 397 (1995). The Court of Appeals instead acted as though the amendment—from a

largely permissive to a mandatory exhaustion regime—
had not taken place.[2]

### B

Yet our rejection of the Fourth Circuit's "special circum-
stances" exception does not end this case—because the
PLRA contains its own, textual exception to mandatory
exhaustion. Under §1997e(a), the exhaustion requirement
hinges on the "availab[ility]" of administrative remedies:
An inmate, that is, must exhaust available remedies, but
need not exhaust unavailable ones. And that limitation on
an inmate's duty to exhaust—although significantly dif-
ferent from the "special circumstances" test or the old
CRIPA standard—has real content. As we explained in
*Booth*, the ordinary meaning of the word "available" is
"'capable of use for the accomplishment of a purpose,' and
that which 'is accessible or may be obtained.'" 532 U. S.,
at 737–738 (quoting Webster's Third New International
Dictionary 150 (1993)); see also Random House Dictionary
of the English Language 142 (2d ed. 1987) ("suitable or
ready for use"); 1 Oxford English Dictionary 812 (2d ed.
1989) ("capable of being made use of, at one's disposal,
within one's reach"); Black's Law Dictionary 135 (6th ed.
1990) ("useable"; "present or ready for immediate use").
Accordingly, an inmate is required to exhaust those, but
only those, grievance procedures that are "capable of use"
to obtain "some relief for the action complained of." *Booth*,
532 U. S., at 738.

To state that standard, of course, is just to begin; courts
in this and other cases must apply it to the real-world

---

[2] Of course, an exhaustion provision with a different text and history
from §1997e(a) might be best read to give judges the leeway to create
exceptions or to itself incorporate standard administrative-law excep-
tions. See 2 R. Pierce, Administrative Law Treatise §15.3, p. 1245 (5th
ed. 2010). The question in all cases is one of statutory construction,
which must be resolved using ordinary interpretive techniques.

workings of prison grievance systems. Building on our own and lower courts' decisions, we note as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief. See Tr. of Oral Arg. 27–29 (Solicitor General as *amicus curiae* acknowledging these three kinds of unavailability). Given prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise. See *Woodford*, 548 U. S., at 102. But when one (or more) does, an inmate's duty to exhaust "available" remedies does not come into play.

First, as *Booth* made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U. S., at 736, 738. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In *Booth*'s words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." *Id.,* at 736, and n. 4. So too if administrative officials have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." *Id.,* at 738. When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. As the Solici-

tor General put the point: When rules are "so confusing that . . . no reasonable prisoner can use them," then "they're no longer available." Tr. of Oral Arg. 23. That is a significantly higher bar than CRIPA established or the Fourth Circuit suggested: The procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning. See §7(a), 94 Stat. 352; 787 F. 3d, at 698–699; *supra,* at 3, 6–8. When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. See *Goebert* v. *Lee County,* 510 F. 3d 1312, 1323 (CA11 2007); *Turner* v. *Burnside,* 541 F. 3d 1077, 1084 (CA11 2008) ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available"). Accordingly, exhaustion is not required.

And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In *Woodford*, we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[] up all but the most skillful prisoners." 548 U. S., at 102. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable.[3] And then, once again, §1997e(a) poses

---

[3] See, *e.g., Davis* v. *Hernandez,* 798 F. 3d 290, 295 (CA5 2015) ("Grievance procedures are unavailable . . . if the correctional facility's

no bar.

The facts of this case raise questions about whether, given these principles, Blake had an "available" administrative remedy to exhaust. As explained earlier, Ross's exhaustion defense rests on Blake's failure to seek relief through Maryland's ARP process, which begins with a grievance to the warden and may continue with appeals to the Commissioner of Correction and the IGO. See *supra*, at 2–3; Inmate Handbook, at 30–31. That process is the standard method for addressing inmate complaints in the State's prisons: The Inmate Handbook provides that prisoners may use the ARP for "all types" of grievances (subject to four exceptions not relevant here), including those relating to the use of force. *Id.*, at 30; see App. 312. But recall that Maryland separately maintains the IIU to look into charges of staff misconduct in prisons, and the IIU did just that here. See *supra*, at 2. Blake urged in the courts below that once the IIU commences such an inquiry, a prisoner *cannot* obtain relief through the standard ARP process—whatever the Handbook may say to the contrary. See 787 F. 3d, at 697; App. to Pet. for Cert. 38, 2012 WL 5568940, at *5. And in this Court, that issue has taken on new life. Both Blake and Ross (as represented by the

———————

staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis deleted)); *Schultz* v. *Pugh*, 728 F. 3d 619, 620 (CA7 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy"); *Pavey* v. *Conley*, 663 F. 3d 899, 906 (CA7 2011) ("[I]f prison officials misled [a prisoner] into thinking that . . . he had done all he needed to initiate the grievance process," then "[a]n administrative remedy is not 'available'"); *Tuckel* v. *Grover*, 660 F. 3d 1249, 1252–1253 (CA10 2011) ("[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be 'available'"); *Goebert* v. *Lee County*, 510 F. 3d 1312, 1323 (CA11 2007) (If a prison "play[s] hide-and-seek with administrative remedies," then they are not "available").

Maryland attorney general) have lodged additional materials relating to the interaction between the IIU and the ARP. And *both* sides' submissions, although scattershot and in need of further review, lend some support to Blake's account—while also revealing Maryland's grievance process to have, at least at first blush, some bewildering features.

Blake's filings include many administrative dispositions (gleaned from the records of other prisoner suits) indicating that Maryland wardens routinely dismiss ARP grievances as procedurally improper when parallel IIU investigations are pending. One warden, for example, wrote in response to a prisoner's complaint: "Your Request for Administrative Remedy has been received and is hereby dismissed. This issue has been assigned to the Division of Correction's Internal Investigative Unit (Case #07–35–010621I/C), and will no longer be addressed through this process." Lodging of Respondent 1; see also, *e.g., id.*, at 18 ("Admin. Dismiss Final: This is being investigated outside of the ARP process by I.I.U."). In addition, Blake has submitted briefs of the Maryland attorney general (again, drawn from former prisoner suits) specifically recognizing that administrative practice. As the attorney general stated in one case: "Wilkerson filed an ARP request," but "his complaint already was being investigated by the [IIU], superceding an ARP investigation." *Id.*, at 23–24; see also, *e.g., id.,* at 5 (Bacon's grievance "was dismissed because the issue had been assigned to [the] IIU and would no longer be addressed through the ARP process").[4]

––––––––

[4] Blake further notes that in 2008, a year after his beating, Maryland amended one of its prison directives to state expressly that when the IIU investigates an incident, an ARP grievance may not proceed. See App. 367, Md. Div. of Correction, Directive 185–003, §VI(N)(4) (Aug. 27, 2008) (The Warden "shall issue a final dismissal of [an ARP] request for procedural reasons when it has been determined that the basis of the complaint is the same basis of an investigation under the authority of

And Ross's own submissions offer some confirmation of Blake's view. Ross does not identify a single case in which a warden considered the merits of an ARP grievance while an IIU inquiry was underway. See Tr. of Oral Arg. 6 (Maryland attorney general's office conceding that it had found none). To the contrary, his lodging contains still further evidence that wardens consistently dismiss such complaints as misdirected. See, *e.g.,* Lodging of Petitioner 15 (District Court noting that "Gladhill was advised that no further action would be taken through the ARP process because the matter had been referred to the [IIU]"). Indeed, Ross' materials suggest that some wardens use a rubber stamp specially devised for that purpose; the inmate, that is, receives a reply stamped with the legend: "Dismissed for procedural reasons . . . . This issue is being investigated by IIU case number: ____. No further action shall be taken within the ARP process." *Id.,* at 25, 32, 38; see Tr. of Oral Arg. 8–9 (Maryland attorney general's office conceding the stamp's existence and use).

Complicating the picture, however, are several cases in which an inmate refused to take a warden's jurisdictional "no" for an answer, resubmitted his grievance up the chain to the IGO, and there received a ruling on the merits, without any discussion of the ARP/IIU issue. We confess to finding these few cases perplexing in relation to normal appellate procedure. See *id.,* at 3–10, 13–15, 18–20 (multiple Justices expressing confusion about Maryland's procedures). If the IGO thinks the wardens wrong to dismiss complaints because of pending IIU investigations, why does it not say so and stop the practice? Conversely, if the IGO thinks the wardens right, how can it then issue merits decisions? And if that really is Maryland's proce-

_____

the [IIU]"); Brief for Respondent 17–18. According to Blake, that amendment merely codified what his submissions show had long been the practice in Maryland prisons. See *ibid.*

dure—that when an IIU investigation is underway, the warden (and Commissioner of Correction) cannot consider a prisoner's complaint, but the IGO can—why does the Inmate Handbook not spell this out?  Are there, instead, other materials provided to prisoners that communicate how this seemingly unusual process works and how to navigate it so as to get a claim heard?

In light of all these lodgings and the questions they raise about Maryland's grievance process, we remand this case for further consideration of whether Blake had "available" remedies to exhaust.  The materials we have seen are not conclusive; they may not represent the complete universe of relevant documents, and few have been analyzed in the courts below.  On remand, in addition to considering any other arguments still alive in this case, the court must perform a thorough review of such materials, and then address the legal issues we have highlighted concerning the availability of administrative remedies.  First, did Maryland's standard grievance procedures potentially offer relief to Blake or, alternatively, did the IIU investigation into his assault foreclose that possibility?  Second, even if the former, were those procedures knowable by an ordinary prisoner in Blake's situation, or was the system so confusing that no such inmate could make use of it?  And finally, is there persuasive evidence that Maryland officials thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations, either on a system-wide basis or in the individual case?  If the court accepts Blake's probable arguments on one or more of these scores, then it should find (consistent this time with the PLRA) that his suit may proceed even though he did not file an ARP complaint.

## III

Courts may not engraft an unwritten "special circum-

stances" exception onto the PLRA's exhaustion require-
ment. The only limit to §1997e(a)'s mandate is the one
baked into its text: An inmate need exhaust only such
administrative remedies as are "available." On remand,
the court below must consider how that modifying term
affects Blake's case—that is, whether the remedies he
failed to exhaust were "available" under the principles set
out here. We therefore vacate the judgment of the Court
of Appeals and remand the case for further proceedings
consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————————

No. 15–339

————————

## MICHAEL ROSS, PETITIONER *v.* SHAIDON BLAKE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 6, 2016]

JUSTICE THOMAS, concurring in part and concurring in
the judgment.

I join the Court's opinion except for the discussion of
Maryland's prison-grievance procedures, *ante*, at 11–14,
which needlessly wades into respondent Shaidon Blake's
questionable lodgings of new documents in this Court.
Those documents are not part of the appellate record. See
Fed. Rule App. Proc. 10(a). We have "consistently con-
demned" attempts to influence our decisions by submitting
"additional or different evidence that is not part of the
certified record." S. Shapiro, K. Geller, T. Bishop, E.
Hartnett, & D. Himmelfarb, Supreme Court Practice
§13.11(k), p. 743 (10th ed. 2013). Perhaps Blake's new-
found documents are subject to judicial notice as public
records. See Fed. Rule Evid. 201. But I would not take
such notice for the first time in this Court. It appears that
Blake had a chance to submit many of his documents to
the lower courts and failed to do so. Taking notice of the
documents encourages gamesmanship and frustrates our
review. I would let the Court of Appeals decide on remand
whether to supplement the record, see Fed. Rule App.
Proc. 10(e), or take notice of Blake's lodgings.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–339

_____

## MICHAEL ROSS, PETITIONER *v.* SHAIDON BLAKE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 6, 2016]

JUSTICE BREYER, concurring in part.

I join the opinion of the Court, with the exception that I described in *Woodford* v. *Ngo*, 548 U. S. 81 (2006). There, I agreed that "Congress intended the term 'exhausted' to 'mean what the term means in administrative law, where exhaustion means proper exhaustion.'" *Id.,* at 103 (opinion concurring in judgment). Though that statutory term does not encompass "freewheeling" exceptions for any "'special circumstanc[e],'" *ante*, at 1, it does include administrative law's "well-established exceptions to exhaustion." *Woodford*, *supra*, at 103 (opinion of BREYER, J.). I believe that such exceptions, though not necessary to the Court's disposition of this case, may nevertheless apply where appropriate.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER
McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale Hendrickson ("Plaintiff" or "Hendrickson"), an inmate then in confinement at the Federal Correctional Institution in Otisville, New York ("Otisville"), filed this action for injunctive relief and damages based upon alleged violations of his rights under the United States Constitution, Amendments I, IV, V, VI, IX, and XIII, and upon violations of various laws and/or regulations governing prison administration.[FN1] The Complaint named as defendants G.L. Hershberger ("Hershberger"), the United States Attorney General ("Attorney General"), Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"), Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the Bureau of Prisons ("BOP"), and the Otisville Medical Department ("OTV Medical Department") (collectively "Defendants"). Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set out below, Defendants' Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are employed for dismissing a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a Rule 12(c) motion to dismiss for failure to state a claim upon which relief can be granted. *See Ad–Hoc Comm. of the Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987); *see also Viacom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375 n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R. Miller, *Federal Practice and Procedure* ¶ 1367, at 515–16 (1990). Thus, the Court must read the Complaint generously, drawing all reasonable inferences from the complainant's allegations. *See California Motor Transp. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972). Moreover, "consideration is limited to the factual allegations in [the] amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142 (2d Cir.1993); *accord Allen v. Westpoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112 S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). Defendants, therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H[earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,<sup>FN1</sup> Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
　I. *Introduction* <sup>FN2</sup>
　　FN2. This matter was referred to the undersigned
　　for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

　**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

　II. *Procedural History*

　On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.<sup>FN3</sup> On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

　III. *Facts* <sup>FN4</sup>

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

　On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

> FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

> FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).* Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Larry TINSLEY, Plaintiff,
v.
Gary GREENE, Deputy Superintendent of Great
Meadow Correctional Facility; Jim Lanfear,
Maintenance Supervisor, Great Meadow Correctional
Facility; Gary Yule, Corrections Officer, Great Meadow
Correctional Facility; and David Roberts, Senior
Counselor, Great Meadow Correctional Facility,
Defendants.
**No. 95-CV-1765 (RSP/DRH).**

March 31, 1997.

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General,
Darren O'Connor, Assistant Attorney General, of counsel,
for Defendants.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a
report-recommendation and order by Magistrate Judge
David R. Homer, duly filed on the 13th day of September,
1996. Dkt. No. 24. Following ten days from the service
thereof, the clerk has sent me the entire file, including any
objections thereto. Plaintiff Larry Tinsley filed objections.
Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer
advises that Tinsley failed to establish or raise a genuine
issue of material fact regarding the nature of his

confinement. Report-recommendation, Dkt. No. 24, at
9-10. There is no dispute that prison officials confined
Tinsley to keeplock and loss of some privileges for 60
days after they conducted a search of his cell, found a
marijuana cigarette in the cell, and found Tinsley guilty of
possessing a controlled substance after a Tier III
disciplinary hearing. Tinsley's conviction and sentence
were affirmed on administrative appeal. In his lawsuit
under 42 U.S.C. § 1983, Tinsley raises several charges to
the manner in which defendants conducted the search and
disciplinary hearing. However, Tinsley failed to specify in
any manner that his punishment posed an "atypical and
significant hardship on [him] in relation to the ordinary
incidents of prison life." *Sandin v. Connor,* 515 U.S. 472,
----, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ---- (1995).
Without this showing, plaintiff failed to allege a
deprivation of his Fourteenth Amendment due process
liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley
makes general attacks regarding the alleged bias of
Magistrate Judge David Homer and argues that the
magistrate judge has misconstrued his claims. Plaintiff
also asks me to reconsider defendants' summary judgment
motion and review plaintiffs memorandum opposing the
motion. However, Tinsley has not raised any allegation
regarding the nature of his punishment, which is the
threshold issue under *Sandin.* I have reviewed the entire
file in this matter, including plaintiff's many submissions,
and I find that he failed to raised any issue of fact to
support an alleged deprivation of his due process liberty
interests. Magistrate Judge Homer's thorough
report-recommendation is neither biased nor a
mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of September
13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary
judgment is denied as moot, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

ORDERED that defendants' motion for summary judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.

HOMER, United States Magistrate Judge.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

*2 Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

## I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by

Corrections Officer Rando and defendant Yule and was supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [FN2] and was given a contraband receipt for the cigarette that was removed from his cell.

> FN2. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [FN3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

> FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); *Walker v. Bates*, 23 F.3d 652, 654 (2d Cir.1994), *cert. denied*, 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the

statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

was found in Tinsley's cell. Testimony during hearing by Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

**\*3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

### 1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3-7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[FN4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

> FN4. New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1-.7 (1995).

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See Orellana v. Kyle,* 65 F.3d 29, 31-32 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the deprivation complained of was solely confinement in segregated housing. *See, e.g., Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996) (segregation without more implicates no liberty interest); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995)(placement in administrative segregation not atypical and significant in context of life sentence).

*4 Several judges in this district have adopted this position. *See Polanco v. Allan,* No. 93-CV-1498, 1996 WL 377074, at *2 (N.D.N.Y. July 5, 1996) (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91-CV-510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94-CV-530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94-CV-1119

(N.D.N.Y. Jan. 10, 1996) (Report-Recommendation of M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96-2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91-CV-1445 (N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey,* No. 95-CV-1620, 1996 WL 227859, at *2 (N.D.N.Y. May 2, 1996) (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff's confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g., Bryan v. Duckworth,* 88 F.3d 431, 433-34 (7th Cir.1996) (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996) (noting *Sandin* decided by only 5-4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995) (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *Samuels v. Mockry,* 77 F.3d 34, 37-38 (2d Cir.1996); *see also Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare Silas v. Coughlin,* No. 95-CV-1526, 1996 WL 227857, at *1 (N.D.N.Y. April 29, 1996) (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

interpretation of *Sandin* mandated further fact-finding as to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

**\*5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ----, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927-28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ----, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302-05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ----, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock,

including plaintiff, are the same regardless of the reason for placement there. *Id.* at pts. 302-05.[FN5]

> FN5. Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular program offered at an institution. *Cf. Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

**\*6** 515 U.S. at ---- - ----, 115 S.Ct. at 2299-2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

other inmates or guards such that keeplock confinement imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under *Sandin.* Accordingly, defendants' motion on this ground should be granted.

2. Due Process

Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

**\*7** Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official.[FN6]

> FN6. A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. N.Y. Comp.Codes R. & Regs. tit. 7, § 251-3.1(b) (1995). The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Fourth, plaintiff claims that defendant Roberts failed to provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. [FN7]

> FN7. Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. [FN8] In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. [FN9] Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

> FN8. In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the

marijuana five hours after the search was conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

> FN9. Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

4. Qualified Immunity

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

**\*8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656-57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.

### III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted.[FN10]

FN10. Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in

response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

### IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

*9 Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Tinsley v. Greene

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))


Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy, and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* [N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a)](#) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). See *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. See Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

**4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths**

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

**5. Dismissal of Action**

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

**B. Due Process**

**1. Samuels Pleads a Valid Due Process Claim**

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses

*12 Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

**b. Confidential Informant**

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.'" *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

**c. Assistance Provided by the Employee Assistant**

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See* *Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

> FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition*." Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2014 WL 1289579
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Amin B. BOOKER, Plaintiff,

v.

J. MALY, Deputy Superintendent of
Security, Shawangunk Correctional
Facility, et al., Defendants.

No. 9:12–CV–246 (NAM/ATB).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Amin B. Booker, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Douglas J. Goglia, Esq., Assistant New York State
Attorney, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1** Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c), United States Magistrate Judge
Andrew T. Baxter issued an excellent and thorough Report–
Recommendation and Order (Dkt. No. 113) addressing a
number of motions in this *pro se* inmate civil rights case.
Magistrate Judge Baxter recommended the following: that
plaintiff's motion for summary judgment (Dkt. No. 69)
be denied; that defendants' motion for summary judgment
(Dkt. No. 103) be granted and the complaint dismissed
in its entirety as against all defendants; that plaintiff's
motion for sanctions (Dkt. No. 107) be denied; and that
defendants' cross-motion for sanctions (Dkt. No. 108) be
denied. Magistrate Judge Baxter further denied plaintiff's
motion for appointment of counsel (Dkt. No. 109).

Plaintiff has submitted an objection (Dkt. No. 114) to the
Report–Recommendation and Order. Pursuant to 28 U.S.C.
§ 636(b)(1) (C), this Court reviews *de novo* those parts of
a report and recommendation to which a party specifically
objects. In view of the comprehensive nature of plaintiff's
objections, the Court considers all issues *de novo.* The Court

has reviewed the record in its entirety, including plaintiff's
deposition testimony. Upon *de novo* review, the Court
adopts Magistrate Judge Baxter's Report–Recommendation
and Order in all respects. Reading plaintiff's papers liberally
and interpreting them to raise the strongest arguments that
they suggest, *see McPherson v. Coombe,* 174 F.3d 276,
280 (2d Cir.1999), the Court grants summary judgment to
defendants and dismisses the case.

Plaintiff also moves (Dkt. No. 115) for permission to submit
late exhibits. He states that he is awaiting the arrival of
weather reports, which he says are relevant to his Eighth
Amendment claim of cruel and unusual punishment and
his claim that his confinement in the special housing
unit at Upstate Correctional Facility imposed an atypical
and significant hardship because the cell was cold. David
A. Rock, Superintendent of Upstate Correctional Facility,
submitted a declaration regarding conditions at the facility,
and stated that the cells were maintained at temperatures
between 70 and 74 degrees. Weather reports establishing
cold outdoor temperatures would not aid plaintiff in resisting
summary judgment on this issue. The Court assumes
that the early winter of 2010 was cold in Malone, New
York; nevertheless, summary judgment dismissing plaintiff's
claim based on allegedly cold temperatures in his cell is
warranted based on a number of factors. These include the
undisputed evidence that plaintiff had been issued warm
clothing including a sweatshirt, a winter coat, and a hat; the
fact that plaintiff alleges only mild negative effects which
are insufficient to support an inference that the cell was
unreasonably cold; and plaintiff's testimony that there was
a heating system and that some days he could feel the heat
coming in. [1] Leave to submit late exhibits is denied.

**\*2** It is therefore

ORDERED that plaintiff's motion (Dkt. No. 115) for leave to
submit late exhibits is denied; and it is further

ORDERED that the Report and Recommendation (Dkt. No.
113) of United States Magistrate Judge Andrew T. Baxter is
adopted and accepted; and it is further

ORDERED that defendants' cross-motion for sanctions (Dkt.
No. 108) is denied; and it is further

ORDERED that plaintiff's motion for sanctions (Dkt. No.
107) is denied; and it is further ORDERED that defendants'

motion for summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 69) is denied; and it is further

ORDERED that the action is dismissed with prejudice; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his amended civil rights complaint plaintiff alleges that his due process rights were denied in conjunction with a misbehavior report and disciplinary hearing, after which he was sentenced to a term in the Special Housing Unit ("SHU"). (Amended Complaint "AC") (Dkt. No. 73). Plaintiff also alleges that while he was in SHU, he was housed under conditions which violated his constitutional rights to be free from cruel and unusual punishment, his right to privacy, and his right to practice his religion. Plaintiff seeks declaratory and injunctive relief in addition to a substantial amount of compensatory and punitive damages. (AC at 51–53, ¶¶ A–C). [1]

Several motions are presently pending before this court. Prior to filing his amended complaint, plaintiff filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 69). In his amended complaint, plaintiff has included a motion for class certification. (*See* Dkt. No. 73, ¶¶ 1–41). After plaintiff filed his amended complaint, the defendants responded in opposition to plaintiff's motion for summary judgment and made a cross-motion for summary judgment. (Dkt. No. 103). Plaintiff responded in opposition to the defendants' cross-motion. (Dkt. No. 106). Plaintiff also moved for "sanctions" because he was not satisfied with defendants' response to his summary judgment motion. (Dkt. No. 107). Defendants have responded in opposition to plaintiff's motion for sanctions. (Dkt. No. 108). Plaintiff

has filed a reply to the defendants' "sanctions" response, and plaintiff has also moved for appointment of counsel. [2] (Dkt.Nos.109, 110).

For the following reasons, this court agrees with the defendants and will recommend denying plaintiff's motions for class certification and summary judgment and will recommend granting defendants cross-motion for summary judgment. The court will order the denial of plaintiff's motion for sanctions and his motion for appointment of counsel.

### I. *Complaint*

**\*3** The court will briefly review the facts as stated in the amended complaint [3] and as outlined in Judge Mordue's May 22, 2012 Order as a basis for further discussion of the additional evidence presented by the defendants.

Plaintiff alleges that on March 24, 2010, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow"), he was approved for a "satisfactory behavior preference transfer" to Shawangunk Correctional Facility. ("Shawangunk") (AC ¶¶ 42–43). Plaintiff states that prior to his transfer our of Great Meadow on March 26, 2010, his "draft bags" were searched by Great Meadow staff and approved for transfer with him. (AC ¶ 42). Plaintiff claims that a corrections officer viewed all of plaintiff's photos for "security clearance," and determined that none of plaintiff's property was contraband. (*Id.*)

Notwithstanding this alleged approval, upon plaintiff's arrival at Shawangunk, his property was searched outside of his presence by defendant Kavanaugh in violation of Department of Corrections and Community Supervision ("DOCCS") policy. (AC ¶ 45). Although defendant Kavanaugh was not "trained or certified" by DOCCS in identifying gang insignia, he selected five (5) of plaintiff's personal photographs, and he concluded that they contained "Blood Gang hand signs," in violation of an "unpublished departmental rule # 105.13 Gangs." (*Id.*) Based upon these photographs, on March 27, 2010, defendant Kavanaugh issued plaintiff a misbehavior report for violating the "unconstitutionally vague prison gang rule ." (AC ¶¶ 22, 45–48). [4]

Plaintiff claims that, in furtherance of a conspiracy to violate plaintiff's civil rights, defendant Smith [5] assigned defendant Maly [6] as the hearing officer for plaintiff's disciplinary hearing. (AC ¶ 51). Plaintiff claims that he possessed all of the

photographs in question for many years, and the pictures had been viewed by countless officers, during searches at various facilities. (AC ¶¶ 88–93) (description of the photographs). Plaintiff claims that some of the pictures were taken inside DOCCS facilities as part of the "inmate photo program," which is conducted and monitored by corrections officers, and thus the pictures should not have been found to be "gang" materials. (AC ¶ 88). Plaintiff alleges that defendant Maly denied plaintiff due process at the hearing by denying him witnesses, being biased, and finding plaintiff guilty on insufficient evidence. (AC ¶¶ 52–87).

Plaintiff alleges that defendant Kober, a Counselor at Shawangunk and a witness, called by hearing officer Maly, testified that the people in the photographs were making "gang signs." Plaintiff claims that, after the hearing, defendant Kober admitted to plaintiff that he lied at the hearing and "confirm [ed the] conspiracy." (AC ¶¶ 94–100). Kober allegedly implied to plaintiff that he lied because there was a "recession," and officers were getting laid off, so the "higher ups" needed SHU cells filled. He told plaintiff not to worry because he could try to get his disciplinary sentence reduced for good behavior. (AC ¶¶ 95, 97). Plaintiff claims that while he was housed in the SHU at Shawangunk, he witnessed three other African–American inmates "get falsely charged with this same prison gang rule." (AC ¶ 100). Although plaintiff wrote to Superintendent Smith complaining of the denial of due process and of defendant Kober's "confession," plaintiff's administrative appeals were denied at both the facility and the Commissioner's level. (AC ¶ 101–103).

**\*4** On April 23, 2010, plaintiff was transferred to Upstate Correctional Facility ("Upstate") to serve his SHU sentence. The amended complaint states that plaintiff was taken to Downstate Correctional Facility prior to his transfer to Upstate. (AC ¶ 105). Plaintiff complains that the bus ride from Downstate to Upstate was unreasonably slow and that the inmates' meals were unsatisfactory. (AC ¶ 106). He complains about the guards stopping at too many rest areas. Although plaintiff does not make any claims regarding the trip itself, it appears that this transportation issue is part of plaintiff's claim that defendants are conspiring to find inmates guilty of misbehavior to keep the SHU facilities open, and the guards are getting overtime pay for the transportation. (AC ¶ 39). The longer it takes to bring the inmates to the SHU facility, the more money spent in overtime.

As part of the class action argument, plaintiff also alleges that the defendants are trying to keep their Aggression Replacement Therapy ("ART") program funded by increasing the number of inmates who are assigned to the program. The increase in inmate participants is allegedly accomplished by falsely charging inmates with misbehavior that is associated with violence, such as gang activity and then forcing those inmates to participate in ART at the risk of having "a negative effect on his conditional release date, his good time credits, his family reunion participation, and other department privileges and work options." (AC ¶¶ 33–35). Plaintiff adds defendant Cook to the list of defendants who are responsible for forcing inmates to participate in ART. (AC Twelfth Cause of Action ¶ 1(a), (2)(f)).

While at Upstate, plaintiff alleges that he was subjected to "atypical and significant" as well as cruel and unusual conditions of confinement. Plaintiff claims that he was forced to share a small cell with another inmate, and that his right to privacy was denied while showering, using the toilet, and dressing. (AC ¶¶ 120–24). Plaintiff also alleges that the lights were left on continuously, making it very difficult for him to sleep (AC ¶¶ 114–19); the showers were dirty and he was given insufficient cleaning materials (AC ¶¶ 125–30); he was denied proper winter garments (AC ¶¶ 131–36); he was handcuffed when outside of his cell; was only allowed one visit per week in unsatisfactory conditions; had to request his "necessities;" had no contact with other human beings outside of his cell mate; was served extremely small portions of food; was deprived of 97% of his personal property; and was denied the opportunity to work. (AC ¶ 137(a)-(f)). Plaintiff outlined various other restrictions to which he was subjected in SHU. (AC ¶¶ 138(a)-(f)).

Plaintiff states that while he was confined in SHU, his First Amendment right to practice his religion was violated. Plaintiff is Muslim, and he was not allowed to attend any congregate religious services (for which there is no substitute), he was not allowed to perform fithra (hair removal); he was not afforded access to an Imam; and was "daily" subjected to viewing another individual's nudity, as well as others viewing his nudity, in direct violation of the tenets of Islam. (AC ¶¶ 139–47). Plaintiff claims that defendants Rock and Fischer condoned and controlled a policy which forced plaintiff to share a cell with another individual without providing a partition to shield the inmates from "indecent exposure ." (AC ¶ 148).

**\*5** Plaintiff claims that defendants Maly, Smith, Kavanaugh, Kober, Fischer, [7] Prack, [8] Rock, [9] and Cook [10] entered into a civil conspiracy to violate plaintiff's (and other inmates') First, Fourth, Eighth, and Fourteenth Amendment rights. Plaintiff claims that these defendants have conspired to charge African–American and LatinoAmerican inmates with gang activity under an unconstitutionally vague rule, find them guilty, [11] and sentence them to serve time in SHU and requiring their participation in the federally funded Aggression Replacement Training program ("ART").

Plaintiff alleges that defendants have intentionally failed to publish the rule in the DOCCS rule book, "although they received the funding to print the rule inside the rule book...." (AC ¶ 24). Plaintiff claims that the defendants have conspired to withhold adequate notice of the prohibited conduct so that they may continue to write false misbehavior reports. (AC ¶ 25). Plaintiff alleges that the hearings are conducted in isolated locations so that inmates may be intimidated into pleading guilty. (AC ¶ 29). Plaintiff alleges that there are no criteria used to distinguish between gang materials and non-gang materials. (AC ¶ 27).

Plaintiff states that as a result of this conspiracy, (1) DOCCS receives additional money from the government because the defendants have inflated the number of inmates who "need" the ART program; (2) the need for SHU facilities has been manipulated by increasing the capacity/occupancy of SHU cells unnecessarily through the "prison gang rule scam," and (3) more overtime, and consequently more money, is generated for DOCCS staff who must transport the inmates to SHU facilities. (AC ¶¶ 22–41).

Plaintiff has again asked for class action status. (AC ¶¶ 1–7). In this request, plaintiff alleges that he wishes to bring this action "on behalf of himself and other identified and unidentified inmates incarcerated in the New York State [DOCCS]." (AC ¶ 1). Plaintiff alleges that his claims are typical of the "class," and that he will fairly represent the members of the class because he is a "direct victim," but he also asks the court to appoint a class counsel. (AC ¶¶ 3–6).

Plaintiff alleges that for years, plaintiff and other inmates have complained about the lack of procedural safeguards at disciplinary hearings wherein violations of the "vague" prison gang rule are charged. (AC ¶ 7). Plaintiff alleges that the rule unfairly characterizes their "cultural expressions" as amounting to "gang activity." (*Id.*) Plaintiff alleges that the

injunctive relief that he has requested will affect all the class members, and therefore, class certification should be granted.

The amended complaint contains twelve causes of action. As Judge Mordue found, construed liberally, in addition to the civil conspiracy noted above by defendants Maly, Smith, Kavanaugh Kober, Fischer, Prack, Rock, and Cook (Twelfth Cause of Action), plaintiff also alleges that (1) defendants Maly, Smith, Prack, and Fischer denied plaintiff due process in violation of the Fourteenth Amendment (First and Second Causes of Action); (2) defendants Maly, Smith, Prack, Fischer, and Rock subjected plaintiff to cruel and unusual conditions of confinement in violation of his rights under the Eighth Amendment (Third, Fourth, Fifth and Sixth Causes of Action); (3) defendant Rock caused a violation of plaintiff's right to privacy in violation of the Fourth Amendment (Seventh Cause of Action); and (4) defendants Maly, Smith, Prack, Fischer, Rock, Rokace, Taylor and Dumas interfered with plaintiff's ability to freely practice his religion in violation of his First Amendment rights and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Eighth, Ninth, Tenth, and Eleventh Causes of Action).

## II. *Class Action*

**\*6** Plaintiff has simply repeated the paragraphs of his original complaint that request the court to grant class actions status under Fed.R.Civ.P. 23. (*Compare* Compl. ¶¶ 1–7, 18–41 *with* AC ¶¶ 1–7, 18–41). Judge Mordue has already denied plaintiff's motion for class certification based upon the same facts. Although Judge Mordue denied plaintiff's motion "without prejudice," plaintiff has cited nothing that would change Judge Mordue's analysis. Thus, to the extent that plaintiff is again requesting class certification, this court recommends that it be denied, and will proceed based upon plaintiff's individual claims. [12]

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving

party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Due Process (First and Second Causes of Action)*

### A. Legal Standards

### 1. Procedural Due Process

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

**\*7** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead,

cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

### 2. Notice/Vagueness

"Due process requires prison officials to provide inmates with adequate notice of what conduct is prohibited." *Collins v. Goord,* 581 F.Supp.2d 563, 578 (S.D.N.Y.2008) (citing, *inter alia, Chatin v. Coombe,* 186 F.3d 82, 87 (2d Cir.1999). " 'Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct. The underlying rationale ... [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice....' " *Williams v. Fischer,* 08–CV–413 (TJM/DRH), 2010 WL 3910129, at \* 10 (N.D.N.Y. Aug. 17, 2010) (quoting *Leitzsey v. Coombe,* 998 F.Supp. 282, 289 (W.D.N.Y.1998)). A disciplinary rule "is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule." *Id.* (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)).

### B. Application

### 1. Liberty Interest

In this case, plaintiff was found guilty of the possession of gang-related material, but was found not guilty of possessing another inmate's legal work. (Goglia Decl. Ex. B at 4.) He was sentenced to one year in SHU for the possession of gangrelated photographs. Even though plaintiff only served 264 days of his one year sentence in SHU, defendants do not contest, and this court will assume for purposes of this recommendation, that plaintiff had a protected liberty interest. Thus, the court need not engage in a lengthy analysis of whether plaintiff suffered an atypical and significant hardship, [13] and instead, may proceed to an analysis of whether plaintiff was afforded the requisite procedural safeguards.

### 2. Advance Notice of Charges

**\*8** Plaintiff was served with his misbehavior report on March 27, 2010. (Kober Aff. Ex. B at 1) (Hearing Transcript ("HT")) (Dkt. No. 103–15); (Goglia Decl. Ex. B at 4, 5) (indicating delivery date and time). His hearing commenced on April 1, 2010. (*Id.*) The misbehavior report specified the rules that plaintiff was alleged to have violated. (Goglia Decl. Ex. A). The explanation in the misbehavior report was quite clear that Officer Kavanaugh had been assigned to search plaintiff's personal property, and that during the course of that search, found the five photographs that were said to be "gang-related material," in violation of Rule 105.13. (*Id .*) Officer Kavanaugh also stated that he found legal material belonging to another inmate in violation of Rule 113.27. (*Id.*) Thus, plaintiff had "advance notice of the charges" as required for *procedural due process.*

### 3. Witnesses/Documentary Evidence

Plaintiff was given a choice of employee assistants for the hearing, and he chose Sergeant Checcia, who met with plaintiff on March 27, 2010. (HT at 1); (Goglia Decl. Ex. B at 5) (Dkt. No. 103–9). Sergeant Checcia determined that plaintiff wished to call Inmate Perez as a witness, and during the hearing, defendant Maly confirmed plaintiff's request. (*Id.* at 1–2). Inmate Perez, the law library clerk at Great Meadow, was called to testify telephonically on plaintiff's behalf relative to the unauthorized possession of another inmate's legal work. (*Id.* at 12–16). Inmate Perez was the only witness who plaintiff requested prior to the hearing. [14] (Goglia Decl. Ex. B at 5) (Hearing Record Sheet).

Plaintiff spent a great deal of time at the hearing, arguing that he never received the memorandum amending Rule 105.13, that the rule was not in the rule book, and that there were no specific criteria to establish whether an inmate's property contained "gang-related" material or depicted gang signs. Plaintiff was given the opportunity to argue that he did not receive the memorandum. (HT at 24–28). When plaintiff told defendant Maly that he had not received the memorandum updating Rule 105.13, defendant Maly adjourned the hearing in order to obtain evidence regarding the plaintiff's receipt of this document. (HT at 8–10). When defendant Maly recommenced the hearing, plaintiff was provided with copies of pages of the "Locator System," a two page copy of the memorandum updating Rule 105.15 that was issued in 2008; and a copy of the redacted Green Haven Log Book for A–Block on May 17, 2008, [15] the time when the memorandum was distributed to all inmates. (*Id.*)

However, when plaintiff requested to call the individual who actually "gave" him the memorandum 2008, the hearing officer denied that "unknown" witness. The hearing officer explained the reason for the denial. (HT at 28–30). There was no indication that anyone in particular gave plaintiff the amended rule. (HT at 29). The document produced by defendant Maly stated that the amendments were "passed out at twenty-two hundred." (*Id.*) Defendant Maly assumed that the floor officers were responsible for passing out the rules. (*Id.*) Thus, defendant Maly's denial of plaintiff's unknown witness, who gave plaintiff the amendment to Rule 105.13 two years prior to the hearing in this case was reasonable, given the documentary evidence supporting the finding that plaintiff received the memorandum when it was distributed to all inmates on the unit. The denial was not a violation of plaintiff's right to present witnesses.

**\*9** What plaintiff does not state in his complaint, or anywhere in his papers, is that he was well aware of the rule and the 2008 memorandum because he brought a lawsuit, making identical claims in 2010, after a prior misbehavior report, charging him with similar behavior. *Booker v. Tokarz,* No. 10–CV–4796, 2012 WL 5431008 (E.D.N.Y. Nov.7, 2012).* Defendants have filed a copy of plaintiff's amended complaint in *Tokarz* as Exhibit D to the Goglia Declaration. In *Tokarz,* plaintiff even made similar claims about the conditions in SHU. (*Id.*)

In *Tokarz,* the plaintiff was charged with the possession of photographs that were considered gang-related material. The hearing officer produced the same documentary evidence as

defendant Maly, showing that plaintiff was given the rule amendment in May of 2008. In *Tokarz,* plaintiff made the same argument that he never personally signed for the rule amendment, and he was given a copy of the memorandum by the hearing officer. (*See Tokarz,* No. 10–CV–4796, Dkt. No. 54–12, Def.s' Ex. I, Pt. 1 at 11–12, 23–24). [16] Clearly, plaintiff is, and was, well-aware of the rule amendment. Even if plaintiff had not received a copy when the rule was distributed to all inmates in 2008, he received a copy of the rule during his disciplinary hearing in *Tokarz.* Plaintiff's argument in this case that he did not receive the memorandum regarding the rule amendment is disingenuous at best. [17]

Plaintiff's request to call the officer who packed his property at Great Meadow was also denied. (HT at 31–32). Defendant Maly denied that witness because plaintiff did not dispute his ownership of the photographs. (HT at 32). Plaintiff did not deny that he owned the photographs, he was trying to show that the unknown officer who packed the photographs did not find that they were gang related. The fact that an officer packed plaintiff's property without noticing or finding that the photographs were gang-related material would not change the fact that defendant Kober found them to be so. Thus, the denial of the "unknown" witness who packed plaintiff's belongings at Great Meadow was not a violation of plaintiff's right to present evidence.

Finally, defendant Maly refused to call defendant Kavanaugh, the author of the misbehavior report to explain why he determined the photos to be gang-related. The court finds that the refusal to call defendant Kavanaugh was reasonable, given that defendant Kober was called to testify about the photographs. The misbehavior report is only a charge that plaintiff has violated a facility rule, and defendant Kavanaugh simply wrote the misbehavior report. The determination of whether plaintiff was guilty of that misbehavior is based upon the evidence presented at the hearing.

### 4. Sufficiency of Evidence

Defendant Maly called Corrections Counselor Kober to testify about gangrelated material. (HT at 17–23). Plaintiff alleges that the evidence was insufficient to find him guilty of the misbehavior because Kober was not qualified to testify about gang signs and was not specific about his reasoning at the hearing. Plaintiff also claims that defendant Maly and defendant Kober "discussed" what Kober was going to say, also showing that defendant Maly was biased.

*\*10* As stated above, the quantum of evidence required for a guilty finding in a prison disciplinary hearing is "some," "reliable" evidence, nowhere near the amount of evidence required for conviction in a criminal case. *Sira v. Morton, supra.* First, in this case, there is absolutely no basis for plaintiff's conclusory statement that defendant Maly prejudiced plaintiff's guilt or conspired to have defendant Kober give false testimony at the hearing, even if Maly did ask defendant Kober to testify. [18] Defendant Kober has submitted an affidavit explaining his testimony and why additional specificity is contrary to security concerns. (Kober Aff.) (Dkt. No. 103–13).

In his affidavit, defendant Kober states that his job as Corrections Counselor includes reviewing the records of "each inmate [who] is transferred into Shawangunk...." (Kober Aff. ¶ 4). Defendant Kober states that he reviewed plaintiff's records prior to meeting him when he was transferred to Shawangunk and noticed that plaintiff had identified himself to corrections officials as a member of the "Bloods." Defendant Kober also noticed that plaintiff was previously charged in misbehavior reports involving gangs or gang-related materials. (*Id.* ¶ 5). Defendant Kober has included plaintiff's disciplinary record as Exhibit A to his affidavit. (Dkt. No. 103–14). The disciplinary record shows that plaintiff has been charged with, and found guilty of, various misbehavior related to gangs and possession of gang-related material. In addition to the misbehavior adjudicated in this case, he was found guilty of behavior dealing with "unauthorized organizations" on June 6, 2002 (Kober Ex. A at 2); on July 26, 2000 (*Id.* at 3); on November 15, 1999. (*Id.* at 4); and on July 7, 1999 (*Id.* at 5).

In addition to defendant Kober's job as a Corrections Counselor, he has been designated to receive training relative to gangs and their activities in the correctional system. (Kober Aff. ¶¶ 6–7). This designation involved initial training as well as continuing education of four hours per month. (*Id.* ¶ 7). However, there are no textbooks for this training, and it is not a course of study that leads to a "certification" as a "gang expert ." [19] Instead, defendant Kober states that the training involves dissemination and discussion of intelligence material about gangs which is obtained from a number of different confidential sources. (*Id.* ¶ 8).

One of the important parts of defendant Kober's training is to learn the means by which gangs identify themselves because a significant number of inmates come into the correctional system with gang affiliations and retain these affiliations

while incarcerated. (*Id.* ¶ 9). These methods of identification serve to enable gang members to identify each other for protection as well as warning to members of rival gangs. (*Id.* ¶ 10). Gang presence and activity within the correctional system presents "a real potential for danger because of their ability to bring about and coordinate organized violence at any time." (*Id.* ¶ 11). The correctional staff must be able to identify the gangs and their members in order to prevent any problems. (*Id.* ¶ 12). Defendant Kober states that it is also important for security to keep confidential the information that he receives as well as the sources from which that information is received in order for the staff to be effective in preventing the problems that can arise because of the gangs. (*Id.* ¶ 13). Once the inmates who belong to the gangs are aware that the staff knows their means of identification, they develop new ways to identify themselves. (*Id.*) This is why defendant Kober does not go into much detail when he is called to serve as a witness at an inmate's disciplinary hearing. (*Id.* ¶ 13).

**\*11** Defendant Kober explains his rationale for determining that the photographs in question depicted gang signs. (Kober Aff. ¶¶ 19–22). Defendant Kober explains that the hand signs in at least four of the five photographs are associated with the Bloods. (*Id.*) Defendant Kober also states that, although he was not asked at the hearing, the Bloods also use the color red as a "common identifying sign," and that in addition to the hand signs, both inmates in one of the photographs are dressed in red from head to toe. (*Id.* ¶ 22). Defendant Kober's testimony was sufficient to constitute "some" evidence at the disciplinary hearing, supporting the hearing officer's determination of guilt.

### 5. Hearing Officer Bias

Plaintiff argues that defendant Maly was not impartial. "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not

rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

Plaintiff believes defendant Maly was "biased" because he did not allow plaintiff to "test" the reliability of the evidence showing that plaintiff received the memorandum regarding rule 105.13. As stated above, plaintiff's entire challenge regarding his "knowledge" of the rule is specious because he brought a law suit in 2010, making the same claim about not getting the memorandum. Defendant Maly's refusal to call witnesses to "test" the evidence was reasonable and did not show that he was biased against plaintiff.

There is nothing in the record to which plaintiff refers that would show bias by defendant Maly sufficient to rise to the level of a constitutional violation. Plaintiff believes defendant Maly was biased because he did not allow plaintiff to call defendant Kavanaugh to testify and instead called defendant Kober to testify about the gang signs depicted in the photographs and appears to claim that Maly and Kober "discussed" the case prior to his testimony. There is absolutely no evidence that any discussion that occurred between Maly and Kober was more than a request that Kober review the photographs for gang-related material and testify to his opinion at the hearing. This does not indicate that defendant Maly "prejudged" the evidence. The fact that Maly called a "trained" officer to testify shows that he was wanted to make sure of the facts, not that he prejudged them.

**\*12** Plaintiff was given a written copy of the disposition and the reasons for the guilty finding. (*Id.* at 6). At the hearing, defendant Maly read, to the plaintiff, the statement of the evidence upon which he relied. (HT at 33). Plaintiff's appeal rights were explained to him, and he was given an appeal form. (HT at 34). Thus, plaintiff's procedural due process rights were not violated in his disciplinary hearing.

### 5. Vagueness

The question remains whether Rule 105.13 itself is vague. The memorandum circulated by DOCCS in 2008 was an amendment to the "Standards of Inmate Behavior." The amendment was meant to clarify the existing rules with respect to gang related materials. (Goglia Decl. Ex. B at 25; Copy of Amendment Memorandum) (Dkt. No. 103–9). The memorandum contained amendments to both Rules 105.13 and 105.14. The amendment to Rule 105.13 read as follows:

105.13—An inmate shall not engage in or encourage others to engage in gang activities or display, wear, possess, distribute or use gang insignia or materials, including, but not limited to, printed or handwritten gang or gang-related material. I, II, III

Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

(*Id.*) Contrary to plaintiff's allegation, the amendment has been published in the Rule Book. *See* 7 N.Y.C.R.R. § 270.2, Rule 105.13 (2012). A review of the amendment shows that the prohibited conduct is clear to a person of average intelligence.

Plaintiff challenges the rule because he claims that it does not set forth specific criteria for determining whether a gesture is a gang sign or whether it is simply "cultural expression." This court disagrees. It is quite clear, according to the rule, that a gang sign is something that another inmate would recognize as creating an inference of a particular gang affiliation. More specificity in the prison context would be impossible because, as stated by defendant Kober, individuals could change the signs to avoid detection, interfering with the security and order of the facility.

In *Klimas v. Lantz,*[20] the inmate challenged a similar Connecticut rule on both First Amendment and Substantive Due Process grounds. Prior to his incarceration, Klimas was a Sergeant–at–Arms of the Hell's Angels Motorcycle Club ("HAMC").[21] 2012 WL 3611018, at *1. The Connecticut Department of Corrections had a "zero tolerance" policy toward gangs and gang-related materials, and viewed the HAMC connection and alignment with "white supremacy groups" as a threat to the safety and security of the inmates and staff. *Id.* at *2. The Directive at issue in *Klimas* provided for the rejection of correspondence that included "letters written in code" or information that would create a clear and present danger of violence and physical harm, or threats to safety and security. *Id.*

**\*13** Another directive defined a "Security Risk Group" as a group of inmates designated by the Commissioner as possessing common characteristics, which serve to distinguish them from other inmates and "which as a discrete entity, jeopardizes the safety of the public, staff, or other inmate(s) and/or the security and order of the facility." *Id.* The rule contained also defined a "Disruptive Group," with general factors for the determination of each type of group. HAMC was designated as a Disruptive Group. *Id.*

The Connecticut Department of Corrections rejected Klimas's correspondence because the materials contained references to HAMC; HAMC-related symbols; and words which contained coded meanings. *Id.* at *3. Klimas was informed that any of his correspondence that contained HAMC logos or insignia would continue to be rejected based upon security concerns. *Id.*

The court in *Klimas v. Lantz* held that "the challenged practice is reasonably related to legitimate penological interests and is not an exaggerated response to prison concerns." *Id.* at *6. With respect to a vagueness challenge, the court held that the vagueness doctrine does not require perfect precision in the drafting of laws. *Id.* at *7 (citing *Rose v. Locke,* 423 U.S. 48, 49, 96 S.Ct. 243, 46 L.Ed.2d 185 (1972). The degree of vagueness that is tolerated depends upon the nature of the enactment, and in reviewing challenged regulations, the court should look to the words of the regulation, the interpretation given to analogous regulations, and the interpretation of the statute given by those who are charged with enforcing it. *Id.* (citing *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). The court held that although the Connecticut Directive implicated an inmate's First Amendment rights, it "gave reasonable notice of the proscribed speech by enumerating the specific circumstances where correspondence would be disapproved." *Id.* The court also stated that the fact that plaintiff may have received or sent correspondence in the past bearing the HAMC indicia "does not undermine the legitimacy of the defendants' rationale for rejecting his mail." *Id.* at *5 n. 4.

The reasoning of *Klimas v. Lantz* supports the defendants' position that the disciplinary rule in this case is not

unconstitutionally vague. Rule 105.13 gives inmates the definition of gangs and of gang-related materials. As stated above, more specificity is not required, and would be very difficult, given the number of gangs[22] and the different methods of symbolic communication that exist. The fact that plaintiff may have been able to possess those pictures at other facilities does not undermine the defendants' desire to regulate gang-related material at their facility. *Klimas v. Lantz,* at *5 n. 4.

The court would also point out that plaintiff is not as naive as he implies. Contrary to his allegations, he has had other issues with gang-related items, including photographs. The court notes that in the 2010 case, he made some of the same challenges to the disciplinary hearing as he makes in this case. The disciplinary hearing was reversed, but the court stated that the reversal was for " 'failure to maintain evidence for review.' " *Booker v. Tokarz,* 2012 WL 5431008 at *2. Plaintiff has identified himself to DOCCS officials as a member of the Bloods, holding the rank of Enforcer. (*See* Dechick Aff. ¶¶ 8–9 & Ex. A) (plaintiff's records show that his gang membership and rank were "self-reported"). Thus, plaintiff is well aware that gangs may communicate through signs and symbols. Even if such communication could also be considered "cultural expression," it is the type of "cultural expression" that may be reasonably regulated. *See Turner v. Safely,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (same).

**\*14** In his response to defendants' motion for summary judgment, plaintiff has attached a photograph of Haile Selassie I, purportedly making the same hand sign that was found to be a gang sign in plaintiff's disciplinary hearing. (Dkt. No. 106–3 at CM/ECF p. 8). Under the photograph is an explanation that the sign is the "Sign of the Holy Trinity," and the "triangle pointing downwards is an esoteric symbol representing the material phase of the Seal of Solomon...." (*Id.*)

Plaintiff has also attached a memorandum, dated February 26, 2001 from Lucien J. Leclaire, Jr., Deputy Commissioner. (*Id.* at 9). The memorandum is addressed to Father James C. Hayes, Chief of Chaplains and is in response to a memorandum sent by Father Hayes. The memorandum states that Deputy Commissioner Leclaire met with Don Selsky,

who was then the Director of Special Housing and Inmate Discipline, and with Dale Artus, who was then the Director of the Crisis Intervention Unit. (*Id.*) These individuals met to discuss that it was "inappropriate for an inmate to be disciplined for *possession of a picture of this nature."* (*Id.*) Deputy Commissioner Leclaire also stated that "Rule 105.12 of the Standards of Inmate Behavior, in no way, addresses hand signals," and that "[a]ny misbehavior report dealing solely with the displaying of hand signals [was] being dismissed by Mr. Selsky's office." The memorandum also states that "the issuance of this type of misbehavior report appears to be at a minimum." (*Id.*)

Plaintiff points out that the hand signal in his photographs was the same as that in the Haile Selassie photo. However, the court would note that the misbehavior report to which the memorandum refers was issued for "a picture of this nature,"-a picture of a well-known individual, published in what appears to be a book, where it is specifically stated that the hand symbol has historical or religious meaning. The court also notes that the disciplinary rule cited in Deputy Commissioner Leclaire's memorandum is not the rule that plaintiff was charged with violating, and the amendment to the Standards of Behavior was issued in 2008, seven years after the Leclaire memorandum. The Haile Selassie photo is, in no significant way, comparable to the pictures possessed by the plaintiff in this case.

In fact, the photo in plaintiff's exhibit would probably be acceptable under the 2008 amendment because the amendment excludes "published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process." Rule 105.13. In addition, the fact that a gang may have adopted a symbol that is also a religious or historical symbol as a method of identification does not make that symbol any less gang-related. The regulation is not unconstitutionally vague. Thus, plaintiff's due process claims, both procedural and substantive may be dismissed as against defendants Kavanaugh, Maly, Kober, Smith, Prack, and Fischer.[23]

## V. *SHU Conditions (Third, Fourth, Fifth, and Sixth Causes of Action)*

### A. Legal Standards
**\*15** The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114

S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.' " *Farmer v. Brennan,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett,* 379 F.3d 462, 464 (7th Cir.2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835.

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Carlson v. Parry,* No. 06–CV–6621, 2012 U.S. Dist. LEXIS 44292, at *20–21, 2012 WL 1067866 (W.D.N.Y. Mar.29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[ ] sufficient to satisfy the subjective component of the deliberate indifference standard. *Id.* (citing *Farmer,* 511 U.S. at 842; *Proffitt v. Ridgeway,* 279 F.3d 503, 506 (7th Cir.2002); *Bagola v. Kindt,* 131 F.3d 632, 646 (7th Cir.1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett,* 379 F.3d at 465 (citing *Fruit v. Norris,* 905 F.2d 1147, 1150–51 (8th Cir.1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

**B. Application**

**1. General Conditions in SHU**

*16 The court would first point out that plaintiff's Third Cause of Action names only defendant Maly as "responsible" for the unconstitutional conditions of confinement because he found plaintiff guilty (and sentenced him to SHU). (AC at CM/ECF p. 45). Plaintiff's Fourth Cause of Action names defendants Smith and Prack as being responsible for the unconstitutional conditions in SHU because they affirmed defendant Maly's disciplinary finding. However, plaintiff made the same claim about the hearing officer in *Tokarz,* and the court held that at most, the hearing officer intended that plaintiff be confined in SHU. There was no intention or awareness that plaintiff would be exposed to unconstitutional conditions while in SHU. Thus, the Eighth Amendment claims were dismissed as against the individuals responsible for the disciplinary determination. 2012 WL 5431008, at *7.

This court agrees. Restrictive SHU conditions on their own do not per se rise to the level of cruel and unusual punishment. *Inesti v. Hogan,* No. 11 Civ. 2596, at *24 (S.D.N.Y. Mar. 5, 2013) (normal conditions of SHU confinement are not violations of the Eighth Amendment); *Dixon v. Goord,* 224 F.Supp.2d 739, 752 (S.D.N.Y.2002). In addition, defendants are not responsible for conditions in SHU because of any alleged improprieties in the disciplinary hearing that caused the sentence to be imposed. *Id.* Thus, to the extent that plaintiff blames defendants Maly, Smith, Prack, and Fischer[24] for the SHU conditions only to the extent that they were involved in the disciplinary hearing at or its review,[25]

any Eighth Amendment claim regarding the subsequent SHU conditions may be dismissed because there is no allegation that any of the three defendants were personally involved in maintaining the conditions in SHU or expected plaintiff to be subjected to anything more than the "normal" conditions in SHU. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (personal involvement in the violation required to establish liability under section 1983); *Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

Plaintiff's sixth cause of action states that defendant Rock, the former Superintendent of Upstate is also responsible for the unconstitutional conditions of the SHU at Upstate. Plaintiff claims that the cells and the showers were dirty and the cleaning supplies were unsatisfactory. He states that he was forced to inhale "sour odors." (AC ¶¶ 125–29). Plaintiff claims that his cell was "uninsulated," and he was denied thermal clothing, boots, a scarf, and gloves for the winter. (AC ¶ 131). Plaintiff also alleges that he was tormented by the illumination in his cell during the night, resulting in burning, watery eyes and fatigue due to lack of proper sleep. (AC ¶ 114–19). Plaintiff alleges that he was assigned to a double cell, and that there were no curtains to shield inmates from each other while they performed their daily hygiene such as showering or using the toilet. (AC ¶¶ 120–24).

 **\*17** Plaintiff also claims that he was frisked when leaving his cell and that restraints were always applied, even when he had a medical appointment. (AC ¶ 137). He lost doctor-patient confidentiality because there were always guards present, he had to be locked in his cell 24–hours per day, seven days per week, with only one hour of daily recreation in a small caged area with no exercise equipment and no sunlight. He was only allowed to receive one visit per week behind a waist-high partition, with no ability to hug, kiss, or embrace his visitors. Plaintiff claims that his wife left him because of the "SHU hardship [and] lengthy sentence." (AC ¶ 137(a)). Plaintiff claims that he had to wake up at odd hours to mail his letters and to request necessities from officers who were making rounds. (AC ¶ 137(b)). Plaintiff claims that he had no contact with other human beings outside of his cell-mate; had to receive meals from corrections officers; his food rations were unreasonably small; he was deprived of 97% of his personal property; there was no opportunity for him to work, to study, or to attend programs. (AC ¶ 137(c)-(f)).

Most of the restrictions and limitations that plaintiff states he suffered in the Upstate SHU are normal restrictive, and perhaps, harsh, conditions of SHU. Plaintiff refers to these conditions as atypical and significant. However, as stated above, atypical and significant conditions, compared to the ordinary incidents of prison life, may be sufficient to create a liberty interest, but do not establish an Eighth Amendment violation. The fact that plaintiff had to be shackled when leaving his cell, was confined 23 hours per day; had to receive meals from corrections officers, had to wake up at "odd" hours to mail letters or request "necessities," had limited contact with other inmates, was limited in his visitation rights, or did not have an opportunity to attend programs do not rise to the level of a serious deprivation of basic human needs. *See Beckford v. New York State Office of Mental Health,* No. 06–CV–561, 2010 WL 1816689, at \*12 (W.D.N.Y. May 3, 2010) (citing, *inter alia, McNatt v. Unit Manager Parker,* No. 3:99CV1397, 2000 WL 307000, at \*4 (D.Conn. Jan.18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to the level of Eighth Amendment violation); *Shannon v. Selsky,* No. 04 Civ.1939, 2005 WL 578943, at \*6 (S.D.N.Y. Mar. 10, 2005) ("normal" SHU conditions do not violate the Eighth Amendment) (citing *Graham v. Perez,* 121 F.Supp.2d 317, 322–23 (S.D.N.Y.2000) (finding no serious deprivation resulting from limiting out-of-cell exercise; deprivation of job opportunity; limiting location and content of meals; denying in-cell hot water and electrical outlets; providing inadequate lighting; limiting recreation; limited "stamp buying opportunities;" limiting access to newspapers; personal telephone calls; and requiring them to wear prison-issue clothing)). Thus, plaintiff's general claims that the conditions in SHU violated the Eighth Amendment may be dismissed.

## 2. Nighttime Cell Illumination

 **\*18** There are some conditions of which plaintiff complains that require further analysis. Plaintiff alleges that the lights in SHU were kept on from 7:00 or 8:00 p.m. until 8:00 a.m. the next morning, causing him to suffer from fatigue and causing his eyes to burn and water. (AC ¶ 114). In *Holmes v. Grant,* No. 03 Civ. 3426, 2006 WL 851753, at \*3, 11 (S.D.N.Y. Mar. 31, 2006), the court denied a motion to dismiss on a similar

cell illumination issue,[26] brought by defendants pursuant to Fed.R.Civ.P. 12(b) (6), before transferring the case to the Northern District of New York. Plaintiffs in *Holmes* alleged that defendants' 24–hour per day illumination of their cells at Eastern Correctional Facility, caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems. *Id.* The court simply stated that if these allegations were true, the claim would sustain both the objective and the subjective prongs of an Eighth Amendment analysis. After the case was transferred to the Northern District of New York, the parties voluntarily dismissed the action after coming to a settlement agreement. *Holmes v. Corrections Officers,* No. 9:06–CV– 462 (LEK/DRH) (Dkt.Nos.76, 77).

Other cases have upheld the defendants' maintenance of 24– hour security lighting in prison cells, based upon the facts presented to the court. In a Vermont class action, the district court held that the low wattage security lighting used in Vermont facilities was "of an intensity ... that courts have generally found permissible under the constitution." *McGee v. Gold,* No. 1:04–CV–335, 2010 WL 5300805, at *5 (D.Vt. August 3, 2010)[27], *Report–Recommendation adopted,* 2010 WL 5389996 (D.Vt. Dec.20, 2010), *vacated and remanded on other grounds sub nom. Kimber v. Tallon,* No. 11–1430, 2014 WL 715661 (2d Cir. Feb.26, 2014). Although the district court approved the report-recommendation, the Second Circuit has recently vacated the opinion and remanded the case for further proceedings because the court found that class counsel was inadequate. *Id.* The court made no comment upon the merits of the plaintiffs' claims.

In the cases cited by the Magistrate Judge in *McGee* the court noted that the analysis of this issue was "fact-driven," based upon the degree of illumination, the discomfort that it caused, and the penological concern for the lighting. *See e.g. Vasquez,* 290 F. App'x at 929 (refusal to turn off the light had a valid penological concern); *Shepherd,* 982 F.Supp. at 645 (finding that constant illumination of a jail cell with bright light, which deprived the inmate of normal sleep, violated the inmate's basic rights) (citing *Zatko v. Rowland,* 835 F.Supp. 1174, 1181 (N.D.Cal.1993)); *Wills,* 404 F. Supp 2d at 1230– 31 (plaintiff admitted that the security light was not even bright enough for him to read or write without straining his eyes).

In this case, defendant Rock states in his declaration that each cell in SHU is equipped with an overhead lighting fixture that houses a day-time overhead light and "a separate 3 watt LED night light." (Rock Decl. ¶ 9). The day-time light may

be turned on and off by the inmates in the cell, while the night light is controlled by security staff. (*Id.*) The night lights are kept on between 11:00 p.m. and 6:00 a.m. (*Id.*) Defendant Rock states that the night lights are unobtrusive, but do allow the security staff to see into the cells in order to protect the security of the facility by making sure that inmates are not causing harm to themselves or to their cell mates. (*Id.*) This court notes that a 3–watt LED bulb is much less bright than the 9 or 13–watt illumination that was found acceptable in *Vasquez, McBride,* and *Wills* cited above. Three watts is far from the blinding bright light that plaintiff claims to have endured, causing his burning and watery eyes and rashes.

**\*19** Defendant Rock has also submitted photographs of an SHU cell, depicting a solid door with a very small window. The low wattage night light helps the officers see into the cell **without** disturbing the inmates. The ability to maintain the safety of the inmates and the officers is a legitimate penological interest. Based upon the very low wattage of the light and the fact that the cell would normally be very dark because of the small window in the door, this court finds that plaintiff cannot meet either prong of the Eighth Amendment analysis.[28] Plaintiff's claim that the lighting in his cell amounted to cruel and unusual punishment may be dismissed.

### 3. Clothing and Temperature

Plaintiff alleges that he was not issued "thermols [sic] upon request for the winter season," and that he was also denied boots, a scarf, and gloves. (AC ¶ 131). He also claims that his cell was "uninsulated." (*Id.*) Plaintiff claims that there is a window and a recreation yard door in each cell, but that neither is insulated, and the cold air comes through, keeping the cell "irregularly cold or freezing." (*Id.* ¶ 132). Plaintiff claims that as a result, he suffered from "common colds" and "unreasonable discomfort." (*Id.* ¶ 133). Plaintiff states that he could not take advantage of his recreation time because he was "underdressed," causing an old injury to become stiff, impairing his mobility and causing pain.

Defendant Rock states that every inmate who is admitted to Upstate is issued three shirts; four pairs of pants; three pairs of undershorts/undershirts; three pairs of socks; a pair of sneakers; and a winter coat for outdoor exercise.[29] (Rock Decl. ¶ 13) (citing Rock Decl. Ex. C, SHU Manual at 5) (Dkt. No. 103–23). The manual also states that each cell will be "heated adequately for comfort, as well as lighted adequately to permit reading." (*Id.* ¶ G). Defendant Rock has submitted

photographs of the cells, the exercise areas outside of each cell and the visiting areas. (Rock Decl. Exs. A(1), A(2), D(1), D(2)).

The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) (citing *inter alia Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann,* 387 F.2d 519, 527 (2d Cir.1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis–Charles v. Courtwright,* No. 9:11–CV–147, 2014 WL 457951, at *7–8 (N.D.N.Y. Feb.4, 2014) (adopting Rep't–Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell v. Keane,* 338 F.3d 155, 159, 165 (2d Cir.2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

**\*20** The court would point out that plaintiff arrived at Upstate on April 26, 2010 and left upstate on January 20, 2011. (Rock Decl. ¶ 6). Chances are that plaintiff would not have been subjected to the extremely cold temperatures of which he complains during most of that time period. Plaintiff does not contest that he was issued a winter coat and other clothing that he could use to mitigate the effects of any cold temperatures, even if he was denied some of the winter clothing he requested.[30] *See, e.g., Thompson v. Carlsen,* 9:08–CV–965 (FJS/ATB), 2010 WL 3584409, at *10 (N.D.N.Y. Aug. 16, 2010) (Rep't–Rec.), *adopted,* 2010 WL 3584396 (N.D.N.Y. Sept.7, 2010) ("Even assuming plaintiff's allegations are not exaggerated, he was not subjected to freezing temperatures for prolonged periods, and he was permitted to wear heavy winter clothes to maintain warmth."); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (confining INS detainee in a cold room for a prolonged time period did not meet the objective criteria for an Eighth Amendment violation because he apparently had clothing and was able to get some warmth with blankets, and provide himself with livable conditions). Plaintiff's statement that he caught "common colds" and was uncomfortable "regularly" is not sufficient to rise to the level of an Eighth Amendment claim. His allegation that an old injury stiffened

up because he was cold also does not rise to the level of an Eighth Amendment violation, given the short period of time that he was actually in cold weather at Upstate.

Moreover, plaintiff's conclusory claims that one or more of the defendants were acting with deliberate indifference to the inmates' need for warmth is not supported by the record. The DOCCS staff who worked in the SHU presumably experienced the same temperatures as the inmates. As noted above, former Upstate Superintendent Rock understood that SHU cells were adequately heated and that inmates were provided with sufficient clothing, including a winter coat, to mitigate the effects of any cold temperatures. *See Thompson v. Carlsen,* 2010 WL 3584409, at *11.

## VI. *Privacy (Seventh Cause of Action)*

Shielding one's unclothed figure from the view of strangers is "impelled by elementary self-respect an personal dignity." *Jean Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar.19, 2013) (citing *Michenfeler v. Sumner,* 860 F.2d 328, 333–34 (9th Cir.1988)). However, while an inmate's right to privacy does not vanish altogether when he is imprisoned, that right must yield to a penal institution's need to maintain security. *Id.* (citing *Cumbey v. Meachum,* 684 F.2d 712, 714 (10th Cir.1982). In *Jean–Laurent,* the court noted that " 'recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex'—which would include possible glimpses on the way to the shower—'may be permissible.' " *Id.* (citing *Correction Officers Benev. Ass'n of Rockland Cnty. v. Kralk,* No. 04 Civ. 2199(PG), 2011 WL 1236135, at *11 (S.D.N.Y. Mar.30, 2011) (citations omitted); *Israel v. City of New York,* No. 11 Civ. 7726(JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct.5, 2012) (finding intake strip searches permissible, notwithstanding the presence of other inmates and officers, males and females); *Baker v. Welch,* No. 03 Civ. 2267(JSR)(AJP), 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) (stating that a balance should be struck, which would allow occasional viewing but that would prohibit regular viewing); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) (explaining that cases finding a violation of privacy rights have looked to the frequency or regularity of such viewing, and finding violations only in those cases in which the guards "regularly" watch inmates undressing, using toilet facilities, or showering).

**\*21** Plaintiff alleges that he was forced to conduct his private functions daily "in clear view" of his cell mate (who was of

the same sex) and of male and female personnel who might be walking by the cell. (AC ¶¶ 120–24). Defendants have submitted photographs of the cells in SHU. (Rock Decl. Exs. A(1) & A(2)). The pictures show that the cell door is solid with a very small window opening that is on the top half of the door, [31] with the toilet toward the front, left side of the cell. (*Id.* Ex. A(1)). Even with the door open, an individual looking straight through the cell cannot see the toilet. With the door closed, it would be almost impossible to see someone using the toilet unless the guard actually walked up to the door to look inside the cell, and even then, the guard would have to specifically look down to see the toilet. (*Id.*) While it is true that the shower does not have a door or a curtain, defendant Rock states that Muslim inmates are allowed to wear boxer shorts in the shower if they wish to avoid being completely nude. (Rock Decl. ¶ 33).

Plaintiff states in his response to the defendants' summary judgment motion, that any attempt to "shield himself" while housed in Upstate was met with the threat of a misbehavior report, and he cites the defendants' memorandum of law at pp. 27–28. However, that section of the defendants' memorandum of law says just the opposite—that "while inmates generally may not obstruct the view into their cells for security reasons, they are permitted to hang a sheet across their cells to obtain privacy while actually showering or using the toilet." (Dkt. No. 103–4 at 28 & Rock Decl. ¶ 31). Additionally, defendants state that the water to the cell showers is only turned on during recreation time, and "any inmate wishing to shower in private may ask his cellmate to go into the adjoining outdoor recreation area." (Rock Decl. ¶ 32). Thus, plaintiff had ready alternatives to protect his right to privacy, and any occasional viewing by members of the same or opposite sex did not rise to the level of a constitutional violation.

## VI. *Religious Rights (Eighth, Ninth, Tenth, and Eleventh Causes of Action)*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). The right is not extinguished simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993)). However, the right "is not absolute

or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007).

**\*22** To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909, at *8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. [32] *See* 42 U.S.C. § 2000cc-1(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d at 504–05; *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr.22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

### B. Application

Plaintiff alleges that his First Amendment right to practice his religion was violated because he was not able to attend religious services, study groups, or engage in fithea (hair removal). (AC ¶ 139). Plaintiff claims that there is no substitute for his weekly Juma services, he was not afforded any access to the Imam, and he was forced to view his cell-mate's nudity, as well as appear nude before his cell-mate, both of which are forbidden by plaintiff's religion. (AC ¶¶ 142–47). Plaintiff claims that his celebration of Ramadan was disrupted because he was denied access to the appropriate

food, and defendants Taylor, Rakoce, and Dumas denied plaintiff his entire Eid ul Fitr meal on September 18, 2010. (AC ¶ 153–55). On September 17, 2010, defendant Taylor and Dumas did not give plaintiff the proper food because they were not responsible for "NOI"[33] food. (AC ¶¶ 157–58).

With respect to the issue of nudity, the court has discussed the constitutional "privacy" issue in the section above. With respect to the religious implications, the court assumes that the practice burdens the inmate's religious beliefs, however, there are valid penological objectives for prohibiting complete shielding of inmates at all times or for allowing the occasional viewing of male inmates in various states of undress by female officers. Defendants' accommodation involves allowing Muslim inmates to wear boxer shorts or a towel around their waists in the shower, allowing a brief shielding of the cell during the time that the water is turned on for showers, or allowing inmates to ask their cell mates to step out into the recreation pen while the inmate showers or uses the toilet.[34] The court finds that these alternatives are reasonable and finds that the defendants' policy serves a legitimate penological objective. Even if the court were considering the RLUIPA standard, the defendants' alternatives are the least restrictive measure, given the increased security issues in SHU.

**\*23** Inmates in SHU are not allowed to attend congregate services pursuant to Directive 4933; 7 N.Y.C.R.R. § 304.9(d); and SHU Manual at 45. (Rock Decl. ¶ 35). However, these inmates may obtain religious counseling by making a written request to the facility's ministerial staff. (*Id.*) Each SHU inmate is also allowed to have a Qu'ran, a prayer rug, and similar "devotional articles" in his SHU cell. DOCCS Directive No. 4933; 7 N.Y.C.R.R. § 302.3(e) (2); and SHU Manual at 7. Defendant Rock states that an Imam visits Upstate monthly, or whenever an Islamic inmate requests a visit or religious counseling. (Rock Decl. ¶ 36).

In *Walker v. Artus,* the court held that notwithstanding the regulations prohibiting SHU inmates from attending congregate services, DOCCS provides "several accommodations" to Muslim inmates in SHU so that they may practice their religion. *Walker v. Artus,* No. 9:10–CV–1431, 2014 WL 675815, at \*18 (N.D.N.Y. Sept.27, 2013) (Rep't–Rec.), *adopted,* 2014 WL 675815, at \*6–10 (N.D.N.Y. Feb.21, 2014).[35] The accommodations cited in *Walker* are the same as cited by defendants in this action. Plaintiff in *Walker* had requested that, in addition to the other accommodations, he be allowed to watch the congregate

services by video or to listen to a tape recording. The court denied plaintiff's claim, and based its decision both on the First Amendment and RLUIPA, finding that neither was violated.

Defendant Rock states that SHU inmates are not allowed to attend congregate services based upon the risk they pose to institutional security. (Rock Decl. ¶ 37). Defendant Rock states that because of plaintiff's known gang affiliation and his disciplinary history, he is viewed as an increased security risk in addition to being in SHU, and states that releasing plaintiff from confinement to attend congregate services "clearly would have posed a threat to the safety of other prisoners and to the security of Upstate CF." (*Id.*)

Plaintiff alleges that an Imam did not visit the SHU while he was there. (AC ¶ 143). However, defendant Rock notes that, even if an Imam had not been available at Upstate, DOCCS Directive 4202 expressly provides that an inmate may encourage outside clergy to contact the coordinating chaplain and apply to become a "registered religious volunteer." (Rock Decl. ¶ 38 & Ex. E (copy of Directive 4202)). The plaintiff in *Walker* also alleged that the Imam did not visit the SHU regularly. In adopting Magistrate Judge Peebles's recommendation, District Judge D'Agostino found that even assuming that the religious leader did not visit as often as required, "that would not change the fact that Plaintiff received numerous other accommodations to practice his religion...." 2014 WL 675815, at \*8.

Plaintiff alleges that he was unable to perform his religious hair removal. (AC ¶ 139). There is no indication that plaintiff was not allowed to shave while he was in SHU. Defendant Rock states in his declaration that SHU inmates may obtain shaving cream and razors daily before each scheduled exercise period. (Rock Decl. ¶ 43). Plaintiff has not indicated why he may not use the issued razors for shaving purposes, and defendant Rock states that other Muslim prisoners "routinely do this." (*Id.*)

**\*24** Finally, plaintiff alleges that defendants Rakoce, Taylor, and Dumas denied plaintiff his Suhoor Bag[36] during Ramadan on September 17, 2010 and his Eid ul Fitr meal on September 18, 2010. (AC ¶¶ 155–57). Plaintiff alleges that defendant Taylor was giving out the Suhoor bags, but told plaintiff that Taylor only served Shia Muslims, but no "second" officer came by with plaintiff's Suhoor bag. (AC ¶ 157). Plaintiff went without breakfast that day, and he states that when defendant Dumas came by to serve the evening

feast, he told plaintiff that he did not have plaintiff's meal because Dumas was "doing only orthodox sunni meals ." (*Id.*) Once again, he went without a meal, and the area Sergeant never came along to "rectify the matter."

These are the only claims that plaintiff makes against defendants Rakoce, Taylor, and Dumas. Plaintiff does not allege that these individuals intentionally denied him his religious meals. Even according to plaintiff's version of the events, it appears as though these defendants delivered the religious meals for other Muslims, but somehow plaintiff was left out. Defendant Rock states that plaintiff was on the list of Muslim inmates who were participating in the 2010 Ramadan fast, and states that to defendant Rock's knowledge, plaintiff was always given his appropriate meals. (Rock Decl. ¶¶ 39–40). Exhibit F to defendant Rock's declaration shows that plaintiff was on the list of inmates participating in the Ramadan fast. (Rock Aff. Ex. F at 2) (Dkt. No. 103–28). Exhibit F also contains a memorandum from Sergeant Rakoce to FSA D. Haug, stating that defendant Rakoce was the Block Sergeant on September 18, 2010, and that plaintiff never complained to him or advise him that he did not receive his lunch meal.[37] (Rock Aff. Ex. F at 2).

At worst, the amended complaint indicates that defendants Taylor and Dumas made a mistake, thinking that they were serving meals only for other Muslim sects or that someone who was supposed to serve plaintiff's meal did not come afterward. Mistakes, even those amounting to negligence, are not actionable under the First Amendment. *Daniels v. Williams,* 474 U.S. 327, 331–33 (1986) (injuries inflicted by governmental negligence are not addressed by the U.S. Constitution); *Scott v. Shansiddeen,* No. 9:12–CV–84, 2013 WL 3187071, at *4 (N.D.N.Y. May 28, 2013) (Rep't–Rec), *adopted,* 2013 WL 3187071, at *1 (N.D.N.Y. June 20, 2013) (citing *Tafari v. Brown,* No. 9:10–CV–1065, 2012 WL 1098447, at *6 (N.D.N.Y. Mar.30, 2012); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 498 (N.D.N.Y.2009)). In *Shansiddeen,* the court dismissed a First Amendment claim by a plaintiff who missed only two religious meals, in part because plaintiff's claims sounded in negligence, alleging that the defendant failed to catch a mistake made by a clerk regarding the plaintiff's location for delivery of the religious meals, and in part because missing two meals did not "substantially burden" plaintiff's ability to freely exercise his religion.

**\*25** The same is true in this case. Any mistakes made by defendants did not violate plaintiff's constitutional rights, and

as defendant Rock states, as the Superintendent, he is not responsible for serving food to inmates. Defendant Rakoce's memorandum shows that plaintiff was on the list and should have been served his religious meals. If a mistake were made, and plaintiff missed his meals, defendant Rock would have no way of "rectifying" the situation.

Thus, this court finds that plaintiff's religious claims may be dismissed.

## VII. *Conspiracy*

### A. Legal Standards

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d at 468. An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

### B. Application

In this case, because the court has found no constitutional violations, any claim that plaintiff has based upon a "conspiracy" by defendants must fail. First, plaintiff's conspiracy claims all appear to be related to his "class action." To the extent that he claims that anyone conspired to violate his individual constitutional rights, plaintiff has not set forth anything but conclusory allegations that the defendants participated in such a conspiracy.[38] The disciplinary hearing that placed plaintiff into SHU was at one facility, while the "conditions of confinement" that plaintiff claims were unconstitutional were at another facility. There is no indication that the defendants somehow "agreed" on any constitutional or other violations. Even if plaintiff had made a proper vagueness challenge, none of the individuals at Shawangunk would have participated in any conspiracy since

they had nothing to do with the charges or the hearing that placed plaintiff in SHU.

Plaintiff sets forth various conclusory statements about a conspiracy to charge African–American and Latino inmates with gang-related violations in order to force them to participate in the ART program. Plaintiff claims that this is a violation of his First and Fourteenth Amendment rights. He claims that in the ART program inmates are "forced" to admit that their "ethnical [sic] culture is "unauthorized gang, violent, [and] un-american [sic]." (AC ¶ 36). Plaintiff has absolutely no basis for this statement, and as the court has found above, ethnicity is not relevant to the rule prohibiting gangs and gang-related materials. Plaintiff does not claim any other due process violations regarding his placement in the ART program. [39] Thus, any conspiracy claim would have to have been dismissed.

**\*26  WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 103) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 69) be **DENIED,** and it is

**RECOMMENDED,** that plaintiff's motion for sanctions (Dkt. No. 107) be **DENIED,** and it is

**RECOMMENDED,** that defendants' cross-motion for sanctions (Dkt. No. 108) be **DENIED,** and it is

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 109) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* *984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec. of Health & Human Servs.,* *892 F.2d 15 (2d Cir.1989)*); *28 U.S.C. § 636(b)(1);* *Fed.R.Civ.P. 6(a),* *6(e),* *72.*

Filed March 6, 2014.

**All Citations**

Slip Copy, 2014 WL 1289579

Footnotes

1   Plaintiff testified:
    Some days it would be you would feel the heat, actually you could feel the heat coming in there sometime and it was just so cold you could feel the cold as well, and they did have a heating system in there, but because it was more cold than hot, it didn't balance out.

1   The court will cite to the pages of the amended complaint as were assigned by the court's electronic filing system (CM/ECF) in addition to the paragraph number or letter assigned by plaintiff, if one exists.

2   The court notes plaintiff originally moved for appointment of counsel and class certification, together with his original complaint. (Dkt. No. 1). Defendants argue that Judge Mordue has already denied the motion for class certification, and that only the plaintiff's individual claims have been allowed to proceed. (Def.s' Mem. of Law at 5) (Dkt. No. 103–4). However, on May 22, 2012, the court denied plaintiff's motions for appointment of counsel and for class certification *without prejudice.* (Dkt. No. 7 at 4–7). Thus, the court will address both of these motions.

3   The amended complaint did not change plaintiff's claims or his recitation of the facts. Plaintiff amended his complaint to name Corrections Officers Lance Taylor and Daniel Dumas, two individuals who he originally named as "John Does." (AC at ¶¶ 155–61).

4   The court notes that plaintiff has omitted a paragraph # 46.

5   Defendant Joseph Smith was the Superintendent of Shawangunk at the time of the incidents in question.

6   Defendant J. Maly was the Deputy Superintendent of Security at Shawangunk.

7   Defendant Brian Fischer is the Commissioner of DOCCS.

8   Defendant Albert Prack is the Director of Special Housing, who is, among other things, responsible for deciding appeals from facility disciplinary determinations.

**9**    Defendant Rock was the Superintendent of Upstate. He retired on October 30, 2013. (Rock Decl. ¶ 1) (Dkt. No. 103–19).

**10**    Defendant Cook is a Corrections Counselor at Upstate, who put plaintiff on a list for the ART program, notwithstanding that plaintiff told her that he already completed the program and did not need to take it again. (AC ¶¶ 108–112).

**11**    Plaintiff states that the defendants are "in agreement" to have staff members who are not "certified or trained in gang identification" write misbehavior reports, falsely accusing African-American and Latino inmates, based on their innocuous cultural expressions, use of slang or ebonics, poetry, writing, skipping holes in lacing their shoes, and wearing their hair in particular braids. (AC ¶ 23).

**12**    The court does note that if plaintiff were to succeed individually on his claim that the challenged rule was unconstitutionally vague, to the extent that plaintiff seeks injunctive relief, the ruling would affect all inmates, including those that plaintiff alleges form his "class." *See Forts v. Ward,* 621 F.2d 1210, 1217–18 (2d Cir.1980) (in certain circumstances when order benefits all members of the alleged class, class certification would be a mere formality); *Galvan v. Levine,* 490 F.2d 1255, 161 (2d Cir.1973) (certification of class unnecessary when prospective relief would benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment); *Daniels v. City of New York,* 198 F.R.D. 409, 421–21 (S.D.N.Y.2001) (citing cases). Thus, class certification is unnecessary to obtain the prospective relief that plaintiff seeks.

**13**    The court notes that plaintiff spends a great deal of time arguing that the restrictions imposed on him in SHU were "atypical and significant." He seems to confuse this standard for finding a liberty interest with the standard for cruel and unusual punishment which is different and which the court will discuss below.

**14**    Defendant Maly called Inmate Perez as a witness for plaintiff. Perez testified that he was an inmate law clerk and made a mistake in sending plaintiff another inmate's papers. (Kober Aff. Ex. B at 15–16) (Dkt. No. 103–15). As a result of Inmate Perez's testimony, plaintiff was found not guilty of possession of another inmate's legal work. (*Id.* at 33).

**15**    Plaintiff was housed in A–Block at Green Haven at the time that the Rule 105.13 amendment was distributed.

**16**    This court has examined the documents filed in *Tokarz.* However, the review of those documents was not necessary to determine that plaintiff knew about the rule since he brought the same claim as he brings in this case, and defendants have filed plaintiff's own amended complaint in *Tokarz* as an exhibit in this case. The review of the disciplinary hearing transcript in *Tokarz* merely confirms that plaintiff received the memorandum at that hearing.

**17**    The court notes that even if it were not so obvious that plaintiff received a copy of the rule at the hearing in *Tokarz,* the evidence that he was housed in A–Block, and the log book entry, indicating that "all" inmates on A–Block received copies of the memorandum, would have been sufficient evidence *at a prison disciplinary hearing* to show that he received the memorandum. Defendant Maly's denial of unknown witnesses from a different facility, whose conduct occurred two years prior to the disciplinary hearing was quite reasonable and justified as lacking necessity. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (hearing officer may refuse to call a witness due to lack of necessity or irrelevance).

**18**    Defendant Kober states that he was called as a witness by defendant Maly and was asked at the hearing to look at the five photographs to determine whether they contained gang-related material. (Kober Aff. ¶¶ 14, 18).

**19**    At his disciplinary hearing, plaintiff was attempting to determine whether Kober had a "certification." (Kober Aff. Ex. B, Hearing Transcript ("HT") at 22–23).

**20**    *Klimas v. Lantz,* No. 3:08–CV–694, 2012 WL 3611018 (D.Conn. Aug.21, 2012), *aff'd,* 531 F. App'x 6 (2d Cir.2013).

**21**    The court would point out that this plaintiff makes much of the fact that the gang rules target African American and Latino inmates; however, HAMC members were required to be Caucasian. 2012 WL 3611018 at * 1. Thus, gang-related material can apply to any unauthorized organization, and there is no indication in the New York rule cited above that it would target any particular race. It is plaintiff who assumes that gangs are either African American or Latino.

**22**    Exhibit E to defendant Kober's affidavit is an extract from an FBI document, entitled: "2011 National Gang Threat Assessment—Emerging Trends." (Kober Aff. Ex. E) (Dkt. No. 103–18). This document discusses the development of the "National Gang Intelligence Center" ("NGIC"), lists definitions of different types of gangs, and lists the names of many of the gangs that currently exist, including the Bloods, together with the trend in their criminal behavior. (*Id.* at 3–4). In New York State alone, there are *29* different gangs listed. (*Id.* at 4).

**23**    In his first "cause of action," plaintiff names defendant Maly as responsible for the procedural due process violations, and in plaintiff's second cause of action, he states that defendants "Smith, Prack, and Fischer" "condoned and ratified" defendant Maly's violations by refusing to overturn the disciplinary findings. The court notes that in the body of his amended complaint, plaintiff has also named defendants Kavanaugh and Kober as being responsible for the due process violations. Other than writing the misbehavior report, defendant Kavanaugh is not alleged to have participated in the disciplinary hearing. Plaintiff alleges only that defendant Kavanaugh was not qualified to make the gang-related determination and that defendant Maly refused to call him as a witness. Plaintiff claims that defendant Kober "withheld" evidence because

he withheld the criteria that he used for determining whether plaintiff's photographs were gang-related materials, making the evidence "insufficient" to find plaintiff guilty. The court has discussed defendant Kober's involvement above. Because plaintiff's procedural and substantive due process claims may be dismissed, they may be dismissed as against all defendants that plaintiff associated with the due process violations.

24    Defendant Fischer, the Commissioner of DOCCS, is named in the Fifth Cause of Action as responsible for the conditions in SHU in relation to his handling of plaintiff's disciplinary appeal. Plaintiff claims that defendant Fischer violated the Eighth Amendment by continuing the authorization of "cruel and unusual punishment after learning of the due process violations and conditions of confinement under atypical and significant hardship." (AC at 46). Plaintiff also complained that Fischer delegated his decision making to defendant Prack, who was the Director of Special Housing. Passing the decision making on to a subordinate does not rise to the level of personal involvement required to establish liability under section 1983. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

25    In addition, defendants Maly and Smith work at Shawangunk. They would certainly not be responsible for any unconstitutional SHU conditions at Upstate.

26    There were many other issues in *Holmes* that are not relevant herein. Many of the plaintiff's claims were dismissed prior to transfer.

27    The court in *McGee* cited *Vasquez v. Frank,* 290 F. App'x 927, 929 (7th Cir.2008) (24–hour lighting with a single 9–watt fluorescent bulb does not objectively constitute an "extreme deprivation"); *McBride v. Frank,* No. 05–C–1058, 2009 WL 2591618, at *5 (E.D.Wis.Aug.21, 2009) (constant illumination from a 9–watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities"); *Wills v. Terhune,* 404 F.Supp.2d 1226, 1230–31 (E.D.Cal.2005) (holding that 24–hour illumination by 13–watt bulb was not objectively unconstitutional); *Pawelski v. Cooke,* No. 90–C–949–C, 1991 WL 403181, at *4 (W.D.Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd,* 972 F.2d 352 (7th Cir.1992) (table); *compare Keenan v. Hall,* 83 F.3d 1083, 1090–91 (9th Cir.1996) (lighting from "large fluorescent lights" was unconstitutional where plaintiff alleged that he "had no way of telling night or day"); *Shepherd v. Ault,* 982 F.Supp. 643, 646–50 (N.D.Iowa) (summary judgment denied where inmates claimed harm from 60–watt bulbs).

28    In any event, even if the court were to find a constitutional violation, defendants would be entitled to qualified immunity from damages on this issue. Plaintiff has finished his sentence in the Upstate SHU, and other than in his "class" claims, he cannot ask for injunctive relief. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)). Based upon the cases cited above, it is apparent that the low wattage lighting violates no "clearly established" constitutional right of which a reasonable person would have known. The cases are fact-specific, there are many cases finding that all-night lighting does not violate an inmate's Eighth Amendment rights, and the lower and less obtrusive the lighting, the more likely that it will pass constitutional muster. Thus, even if this court were to find a violation, defendants would be entitled to qualified immunity for this claim.

29    The SHU manual also states that inmates will be issued one sweatshirt in addition to the items mentioned by defendant Rock. (Rock Decl. Ex. C at 5, ¶ D).

30    During plaintiff's deposition, he testified that he was issued a hat. (Goglia Aff. Ex. E ("DT") at 88. He testified that he suffered dry, cracked lips and an occasional blister on his face. (DT at 91–92). However, he also testified that "some days" you "would feel the heat, actually you could feel the heat coming in and it was "just so cold you could feel the cold as well, ... it didn't balance out." (DT at 92). The fact that the temperatures "didn't balance out" does not rise to the level of cruel and unusual punishment.

31    Defendant Rock states that the window measures $12''$ by $12''$. (Rock Decl. ¶ 30).

32    However, RLIUPA does not provide for damages against defendants in their official capacities, and although the Second Circuit has not spoken on the issue, numerous district courts have held that RLIUPA does not provide for damages in the

defendant's individual capacity. *See Jean Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *7 n. 9 (S.D.N.Y. Mar.19, 2013) (citing cases).

33   "NOI" stands for Nation of Islam, a Muslim sect that is different from Shia or Sunni Muslims.

34   Defendant Rock states that each cell at Upstate has a door accessing its own exercise area, and that the inmates are given more than the one hour minimum required exercise time per day. In fact the outdoor exercise areas are unlocked "for at least two hours per day pursuant to the SITU manual, and at least half an hour additional time is afforded to inmates who have displayed good behavior and have advanced to "PMS Level III status." (Rock Decl. ¶ 25). PIMS stands for Progressive Inmate Movement System. (*Id.*) There are three different levels of PIMS status for inmates who maintain good behavior while incarcerated at Upstate. Level III affords the most desirable conditions and extent of privileges. (*Id.* & n. 1).

35   The court notes that the Westlaw citation for this decision does not differentiate between the date of the report-recommendation and the date of the district court's adoption. Both decisions are printed together on Westlaw. In this citation, I have indicated the date of the report-recommendation from this court's docket sheet.

36   The Suhoor bag contains an early morning religious meal, eaten during Ramadan before fasting.

37   This memorandum is apparently the investigation of plaintiff's internal grievance, complaining that he did not receive his lunch on September 18, 2010. (Rock Decl. ¶ 42). The court also notes that defendant Rock indicates that there is an Exhibit G, which is the Ramadan Menu for 2010. (Rock Decl. ¶ 40). There is no Exhibit G filed, however, the court does not doubt that there was a Ramadan Menu since plaintiff alleges that other inmates got their food. Thus, the absence of that exhibit is not relevant to the court's findings.

38   The court notes that with respect to defendant Counselor Cook, it is the only claim in which he has been named.

39   The court has already rejected plaintiff's claims that inmates' placement in ART is somehow related to an effort by DOCCS to obtain federal funding and to keep SHU facilities open by falsely charging inmates with misbehavior. In fact, during plaintiff's deposition in this case on January 8, 2013, he testified that he still had not re-taken the ART program because Upstate did not offer the program. (DT at 61).